Rehearing en banc granted, July 14, 2005

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

PERCY LEVAR WALTON,
　　　　　　*Petitioner-Appellant,*

　　　　　v.

GENE M. JOHNSON, Director,
Virginia Department of Corrections,
　　　　　　*Respondent-Appellee.*

No. 04-19

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, District Judge.
(CA-03-347-7)

Argued: December 1, 2004

Decided: April 28, 2005

Before WILKINS, Chief Judge, and MOTZ
and SHEDD, Circuit Judges.

---

Vacated and remanded by published opinion. Judge Motz wrote the
opinion, in which Chief Judge Wilkins joined. Judge Shedd wrote a
dissenting opinion.

---

## COUNSEL

**ARGUED:** Jennifer Leigh Givens, VIRGINIA CAPITAL REPRE-
SENTATION RESOURCE CENTER, Charlottesville, Virginia, for
Appellant. Robert Quentin Harris, Assistant Attorney General,
OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Rich-

mond, Virginia, for Appellee. **ON BRIEF:** F. Nash Bilisoly, VANDEVENTER BLACK, L.L.P., Norfolk, Virginia, for Appellant. Jerry W. Kilgore, Attorney General of Virginia, Richmond, Virginia, for Appellee.

---

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

Percy Levar Walton appeals the denial of his second federal habeas petition, contending that his execution would violate the Eighth Amendment. Specifically, he asserts that to execute him would violate both the prohibition against execution of the insane, *see Ford v. Wainwright*, 477 U.S. 399 (1986), and the prohibition against execution of the mentally retarded, *see Atkins v. Virginia*, 536 U.S. 304 (2002) ("*Atkins I*").[1] In his first federal habeas petition, Walton attacked his convictions and death sentences on numerous grounds. The district court denied that petition, and we affirmed. *Walton v. Angelone*, 321 F.3d 442 (4th Cir. 2003) ("*Walton I*"). Subsequently, however, in the wake of the Supreme Court's decision in *Atkins I*, Walton moved for authorization to file a successive § 2254 petition. We granted such authorization to consider both his *Atkins* claim and his *Ford* claim, which was premature at the time of his original federal habeas petition. The district court denied both claims. For the reasons that follow, we vacate that judgment and remand for further proceedings.

### I.

On October 7, 1997, Walton pleaded guilty to murdering Archie Moore, Elizabeth Kendrick, and Jessie Kendrick in Danville, Virginia. *Walton I*, 321 F.3d at 449. The state trial court sentenced Wal-

---

[1]Incompetence to be executed, or insanity, and mental retardation overlap, of course, but retarded individuals may be competent to stand trial, and, unlike incompetence to be executed, mental retardation must manifest by age 18 to satisfy its clinical definition. *See Atkins I*, 536 U.S. at 318.

ton to death; the Supreme Court of Virginia affirmed, *id.* at 450; and, on December 7, 1998, the United States Supreme Court denied Walton's petition for writ of *certiorari*. *Walton v. Virginia*, 525 U.S. 1046 (1998). The state supreme court ultimately denied Walton collateral relief, *Walton I*, 321 F.3d at 451, and the United States Supreme Court again denied Walton's petition for writ of *certiorari*. *Walton v. Taylor*, 529 U.S. 1076 (2000).

In March of 2000, Walton filed his first federal habeas petition, which the district court denied. *Walton I*, 321 F.3d at 452. This court, in turn, denied Walton a certificate of appealability as to the claims raised in that petition and dismissed his appeal. *Id.* at 467. We noted, however, as the district court had, that under the Supreme Court's decision in *Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998), Walton's *Ford* claim was at that time premature and he would therefore not be barred from raising it again in a subsequent petition. *See Walton I*, 321 F.3d at 452, 467 n.21.[2]

Following our decision, the Commonwealth scheduled Walton's execution for May 28, 2003. Five days before that date, on May 23, 2003, we authorized Walton to file a successive habeas petition to raise his *Atkins* claim, and two days later the district court granted a stay of Walton's execution. In a July 2, 2003 order, the district court dismissed Walton's *Atkins* claim on the pleadings, ruling that "Walton has not satisfied the statutory definition of mental retardation under Virginia law." *Walton v. Johnson*, 269 F. Supp. 2d 692, 700-01 (W.D. Va. 2003) ("*Walton II*"). In the same order, finding "sufficient conflicting evidence," *id.* at 701, regarding Walton's competence to be executed, the court scheduled an evidentiary hearing on Walton's *Ford* claim, noting that under *Martinez-Villareal* that claim was ripe for review. *See id.* at 696, 702.

---

[2]Nevertheless, Virginia now argues that Walton procedurally defaulted his *Ford* claim because he failed to raise it in state court. Brief of Respondent at 49-51. We find the Commonwealth's argument rather disingenuous given that it admitted to the district court that there is no procedure in Virginia for raising a *Ford* claim, itself a troubling admission. *See Ford*, 477 U.S. at 416-17 (plurality opinion) ("[W]e leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.").

Subsequently, the district court held two evidentiary hearings on Walton's *Ford* claim. On March 4, 2004, the district court denied that claim, concluding that "Walton understands that he is sentenced to die by execution and that he is to be executed for murdering three people." *Walton v. Johnson*, 306 F. Supp. 2d 597, 601 (W.D. Va. 2004) ("*Walton III*").

## II.

We first address Walton's *Ford* claim.

### A.

At the July 2003 *Ford* hearing, six witnesses testified on Walton's behalf, including four mental health professionals who had previously treated Walton. Sherri Ann Hopkins, a psychologist charged with monitoring death row inmates at Sussex I State Prison, where Walton is incarcerated, opined that Walton does not understand that he is going to be executed or why he might be executed. "Most people prepare when they're . . . going to Greensville," she said. "He hasn't prepared whatsoever. I don't think he knows what's going to happen to him." Similarly, Dr. Patricia General, a prison psychiatrist who examined Walton several times in April and May 2003, testified that Walton is "floridly psychotic" and does not know what it means that he is going to be executed.

Dr. Anand Pandurangi, director of the schizophrenia program and chairman of inpatient psychiatry at the Medical College of Virginia, also testified on Walton's behalf. Dr. Pandurangi, who had seen Walton several times since 1999, stated that Walton's thinking on the subject of death is delusional, as evidenced in part by his desire to have a telephone, a motorcycle, and a job at Burger King, and to look good for a visit to the shopping mall — all after his execution. Dr. Pandurangi also testified that Walton does not understand "[i]n any sustained sort of way" the fact that he is going to be executed and die or why Virginia has sentenced him to death. Finally, Dr. Pandurangi testified that he does not think Walton is competent to assist in his own defense.

Dr. Ruben Gur, director of the brain behavior center at the University of Pennsylvania, corroborated Dr. Pandurangi's testimony, stating that Walton expressed a desire to "get a Burger King" after his execution. Dr. Gur also testified that Walton does not understand what his execution means. "He does not comprehend what is going on right now as we speak."

Walton's testimony seemingly confirmed Dr. Gur's assessment. In response to repeated questions, Walton failed to communicate sensibly about his sentence or the meaning of his execution:

ATTORNEY: Do you know what your sentence is now, since you're at Sussex?

WALTON: Nah.

ATTORNEY: Can you take a guess?

WALTON: I got — I got a paper saying that I got a hearing May 28th, 2003.

ATTORNEY: May the 28th, 2003, you have a hearing?

WALTON: Yeah.

. . . .

ATTORNEY: If you have an execution date, does that mean that you have been sentenced to death?

WALTON: Umm, nah. I don't think — I don't think so.

ATTORNEY: What does it mean?

WALTON: I believe — I believe — I believe so, but I don't know. You know what I'm saying? I don't know.

ATTORNEY: You believe it does mean you've been sentenced to death?

WALTON:   No.

. . . .

ATTORNEY:   If I told you, or reminded you, that May 28th, 2003, has already passed . . . can you tell me why you weren't executed on that date?

WALTON:   No, I don't know why. I don't even know why.

ATTORNEY:   Do you have any idea? Can you take a guess?

WALTON:   Huh?

ATTORNEY:   Can you take a guess? Do you have any idea?

WALTON:   Umm, no. I don't know.

. . . .

ATTORNEY:   Are you concerned about dying?

WALTON:   No.

ATTORNEY:   Why not?

WALTON:   I don't know.

ATTORNEY:   Do you know what happens when you die?

WALTON:   Umm, no, not really. I don't know. I don't even know what's what. You know, I don't know.

ATTORNEY:   Can you take a guess?

WALTON:   Umm, I don't know. You know what I'm saying? I really don't know, you know that? That's hard. You

know what I'm saying? You know what I'm saying? I don't know. I don't even know.

ATTORNEY: What's hard? You said something was hard.

WALTON: Umm, I don't know. I really — I really don't know. You know what I'm saying? I really — really don't know, you know. I've been through a lot. You know what I'm saying? You know, I really don't know, you know, what's what and stuff. You know what I'm saying? You know what I'm saying?

Also at the July 2003 *Ford* hearing, Dr. Alan J. Arikian, a prison psychiatrist who saw Walton numerous times in 1999 and 2003, testified on behalf of the Commonwealth. Dr. Arikian opined that Walton is "a mature young man who elected a lifestyle which has been a disappointment to him and has not fulfilled his expectations." He further testified that Walton "has a full understanding of what's going on."

After consideration of all of this testimony, the district court did not feel it could resolve the question of Walton's competence to be executed. Accordingly, the court held a second hearing on March 3, 2004, at which Dr. Mark Mills, a forensic psychiatrist whom the parties' experts selected as a neutral expert, testified. *Walton III*, 306 F. Supp. 2d at 599. Prior to that hearing, the court directed Dr. Mills to address two questions: "(1) whether Walton understands that he is to be punished by execution; and (2) whether Walton understands why he is being punished." At the hearing, the court reiterated: "Any . . . questions" other than "whether the petitioner understands that he's being punished by execution" and "whether the petitioner understands why he is being punished" are "extraneous . . . . Anything further is simply irrelevant or immaterial."

In response to this direction, Dr. Mills opined that, given the "focused and . . . circumscribed and . . . limited" standard the district court had asked him to apply, he believed that Walton was competent to be executed. "[M]y sense is that the standard for execution is sufficiently low that, sadly, Mr. Walton meets that standard. He knows enough to meet the judge's questions to him." Dr. Mills also testified,

however, that Walton's condition made it unlikely that Walton would prepare for his death. The district court then concluded, largely on the basis of Dr. Mills' testimony, that Walton is competent to be executed because he "understands that he is sentenced to die by execution and that he is to be executed for murdering three people." *Walton III*, 306 F. Supp. 2d at 601.

B.

In *Ford*, drawing on long-established common law principles, the Supreme Court held that the Eighth Amendment prohibits execution of the insane. 477 U.S. at 406-10. Although the *Ford* Court identified some of the components necessary to demonstrate a constitutionally minimum definition of insanity, application of *Ford* presents challenges because the Court did not define insanity or mandate procedures that courts must follow in determining whether a defendant is insane. The Court left those tasks to the states, and Virginia has yet to enact any definition or procedures of its own. *See supra* note 2.

Furthermore, the precise legal standard for incompetence under *Ford* is complicated by the fact that Justice Powell, who cast the fifth and deciding vote in the case, joined only part of the Court's opinion and wrote separately to explain his view of the "meaning of insanity in this context." *Ford*, 477 U.S. at 418 (Powell, J., concurring). Thus, the Justices in the majority in *Ford* issued three opinions: (1) an opinion for the Court joined by the entire majority, including Justice Powell, *id.* at 401-10, (2) a plurality opinion not joined by Justice Powell, *id.* at 410-18, and (3) Justice Powell's concurrence, *id.* at 418-27.

Based on his reading of these opinions, Walton maintains that the district court misapplied *Ford* in two respects. Initially, he argues that, contrary to the district court's determination, for a defendant to be competent to be executed under *Ford*, he must have an "ability to assist counsel in his own defense." Brief of Petitioner at 35, 47. In addition, Walton maintains that a necessary component of the *Ford* inquiry, not undertaken by the district court, is a determination of whether the defendant is capable of preparing for his own death. *Id.* at 48-50.

1.

With respect to his first argument — that *Ford* competence requires an "ability to assist counsel in [one's] own defense" — Walton cites neither the opinion of the Court in *Ford* nor even the plurality's opinion. He merely asserts that support for this argument "can be rationally formulated from inferences found in the *Ford* plurality opinion." *Id*. at 35.

We, of course, must look to the opinion of the Court to determine the *Ford* requirements. That opinion is silent as to whether a defendant must be able to assist his counsel in order to be found competent to be executed. *See Ford*, 477 U.S. at 401-10. Moreover, Justice Powell, the fifth vote necessary for a majority, expressly rejected this position in his concurrence. It has "slight merit," he reasoned, because in modern times, unlike at common law, "the defendant has access to counsel, by constitutional right at trial, and by employment or appointment at other stages of the process whenever the defendant raises substantial claims." *Id*. at 420 (Powell, J., concurring). Because "a defendant must be competent to stand trial, . . . the notion that a defendant must be able to assist in his defense is largely provided for." *Id*. at 421 (Powell, J., concurring); *see also id*. at 421 n.2 (Powell, J., concurring).

Thus, even though Justice Powell's assurance that it is "unlikely indeed that a defendant today could go to his death with knowledge of undiscovered trial error that might set him free," *id*. at 420 (Powell, J., concurring), has since been called into question, *see*, *e.g.*, 2002 Ill. Governor's Commission on Capital Punishment Rep., *available at* http://www.idoc.state.il.us/ccp/ccp/reports/ commission_report/complete_report.pdf, it is clear that Walton's argument has never garnered a majority of the Court. Indeed, without indicating whether any Member of the Court accepted that position, all that *Ford* instructs is that one Member decisively rejected it.

Nevertheless, Walton argues that we should hold as a condition of *Ford* competence that the defendant have a present ability to assist his counsel. Walton relies on, among other authorities, Justice Frankfurter's dissent in *Solesbee v. Balkcom*, 339 U.S. 9 (1950), Justice Marshall's dissent from the Court's denial of a writ of certiorari in *Rector*

*v. Bryant*, 501 U.S. 1239 (1991), and the American Bar Association standard, which states: "A convict is . . . incompetent if, as a result of mental illness or mental retardation, the convict lacks sufficient capacity to recognize or understand any fact which might exist which would make the punishment unjust or unlawful, or lacks the ability to convey such information to counsel or the court." ABA Criminal Justice Mental Health Standards Standard 7-5.6 (1989).

Despite this venerable authority, and the fact that several states embrace Walton's view, *e.g.*, Miss. Code Ann. § 99-19-57 (2000), in the face of the total silence of the *Ford* Court as to the necessity of the defendant's "ability to assist counsel in his own defense" and Justice Powell's decisive concurrence rejecting consideration of this factor, we decline to hold that in order to find a defendant competent under *Ford*, a court must find that he has the present ability to assist counsel. We note that every circuit to have considered this argument has similarly rejected it. *See Rohan ex rel. v. Gates*, 334 F.3d 803, 809-10 & n.3, 812 (9th Cir. 2003); *Coe v. Bell*, 209 F.3d 815, 826 (6th Cir. 2000); *Barnard v. Collins*, 13 F.3d 871, 877 & n.4 (5th Cir. 1994).

2.

In contrast to his first argument, however, Walton's second contention — that *Ford* demands inquiry into whether the defendant can prepare for his death — is firmly grounded in *both* the opinion of the Court in *Ford and* Justice Powell's concurrence.[3]

In the opinion of the Court, which Justice Powell joined, the Supreme Court explained:

---

[3]The dissent refuses to recognize that Parts I and II of *Ford* are the opinion *of the Court*, in which Justice Powell joined. *See Ford*, 477 U.S. at 401 ("Marshall, J., announced the judgment of the Court and delivered an opinion of the Court with respect to Parts I and II, in which Brennan, Blackmun, Powell, and Stevens, JJ., joined . . . ."). Thus, the dissent erroneously references the "four-member plurality" and the "*Ford* plurality" when citing the *Court's* opinion. *Post* at 29, 31. In fact we rely on the opinion *of the Court*, in which Justice Powell joined, and *never* on any portion of the *Ford* plurality opinion — i.e., Parts III, IV, and V.

> [T]oday, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life. Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today.

*Ford*, 477 U.S. at 409 (citation omitted). In concurrence, Justice Powell emphasized this point:

> If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it.

*Id*. at 422 (Powell, J., concurring).

Thus, unlike Walton's first argument, which the *Ford* Court did not address and Justice Powell, in concurrence, expressly rejected, his second argument finds support in both the opinion of the *Ford* Court and Justice Powell's concurrence. Both agree that it is not enough for a court to determine only that a defendant can recognize the cause and effect between his crime and his punishment. Rather, when deciding whether insanity bars a person's execution, a court must determine whether that person can, in the language of the *Ford* Court, "comprehen[d] . . . why he has been singled out." *Id*. at 409. Or, using Justice Powell's formulation, in order to determine whether a person sentenced to death is "unaware of the punishment [he is] about to suffer and why [he is] to suffer it," a court must consider whether that person is able to "prepare for his passing." *Id*. at 422 (Powell, J., concurring). *See also Garrett v. Collins*, 951 F.2d 57, 59 (5th Cir. 1992) (suggesting that for a defendant's *Ford* claim to survive, he must be able to "prepar[e] for his passing," but upholding state court's rejection of Collins' claim).

Tellingly, although the Commonwealth vigorously urges us to affirm the dismissal of Walton's *Ford* claim, it does not contend that *Ford* requires *no* consideration of a defendant's ability to prepare for his death. Rather, Virginia merely argues that "Walton's counsel's belief that Walton must . . . 'prepare' for his execution as counsel thinks he should 'prepare' . . . cannot constitute grounds for finding Walton incompetent." Brief of Respondent at 47. We agree. However, in this case, it is clear from the record that the district court determined that no consideration of an ability to "prepare" for one's "passing" is necessary under *Ford*.

In reaching its conclusion that Walton is competent to be executed, the district court believed that Walton's ability to prepare for his own death was irrelevant. Thus, the district court told Walton's attorney at the March 2004 evidentiary hearing, "Any . . . questions" other than "whether the petitioner understands that he's being punished by execution" and "whether the petitioner understands why he is being punished" are "extraneous . . . . Anything further is simply irrelevant or immaterial." The expert on which the district court relied, Dr. Mills, clearly felt constrained by the limits of the inquiry imposed by the court. Hence Dr. Mills testified, "The problem for me . . . is the issues that the judge asked me to consider I think are so focused and so circumscribed and so limited that I have opined . . . he meets those limited criteria."

As demonstrated above, *Ford* requires more. A person who can only acknowledge, amidst a barrage of incoherent responses, the bare facts that he will be executed and that his crime is the reason why does not meet the standard for competence contemplated either in the opinion of the *Ford* Court or in Justice Powell's concurrence.[4]

---

[4]We note that, contrary to the dissent's suggestion, our holding is not at odds with Justice Powell's concurrence or the Florida statute, which requires an inmate to be able to "understand" the nature of the death penalty if he is to be executed. *See* Fla. Stat. Ann. § 922.07(3) (West 2001). As Justice Powell said when explaining his view that the Eighth Amendment prohibits execution of the insane: "It is as true today as when Coke lived that most men and women value the opportunity to prepare, mentally and spiritually, for their death." *Ford*, 477 U.S. at 421 (Powell, J., concurring). Furthermore, when formulating his proposed test, he stated:

Undoubtedly, determining whether a person is competent to be executed is not an exact science. And in light of the high stakes of such a determination, the impulse of the district court to confine the inquiry to the most precise possible standard is understandable, particularly since Virginia has yet to adopt procedures for bringing a *Ford* claim. But the inquiry required by *Ford*, "[w]hether its aim be to protect the condemned from fear and pain without comfort of understanding, or to protect the dignity of society itself from the barbarity of exacting mindless vengeance," 477 U.S. at 410, is broader than the inquiry the district court conducted in this case.[5]

Accordingly, we vacate the district court's judgment on Walton's *Ford* claim and remand for further proceedings.

## III.

We next address Walton's *Atkins* claim.

## A.

In *Atkins I*, the Supreme Court held that the Eighth Amendment prohibits execution of the mentally retarded. *Atkins I*, 536 U.S. at 321. As in *Ford*, the Court "'le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their]

---

"[O]nly if the defendant is aware that his death is approaching can he prepare himself for his passing." *Id*. at 422 (Powell, J., concurring). Similarly, none of the cases relied on by the dissent, *see post* at 32, has held that "the *Ford* test does not require" a determination of whether an inmate is able to prepare for his passing. *See id*. at 46-47.

[5]The dissent's concern that our holding will "preclude[ ] capital punishment" for any inmate who claims incompetence to be executed, because the issue of whether an inmate can prepare for his passing is "controlled by the inmate," *post* at 33, is misplaced. We are confident that mental health experts will continue to exercise their professional judgment as to whether particular defendants are malingering. *Cf. Ford*, 477 U.S. at 403 (noting doctor's conclusion that "there was 'no reasonable possibility'" of "'dissembling, malingering or otherwise putting on a performance'").

execution of sentences.'" *Id.* at 317 (quoting *Ford*, 477 U.S. at 416-17) (second and third alterations in original).

Unlike in the case of insanity, however, *see supra* note 2, the Virginia legislature moved quickly in the wake of the Supreme Court's decision in *Atkins I* to establish procedures for regulating execution of the mentally retarded. *See Atkins v. Commonwealth*, 581 S.E.2d 514 (Va. 2003) ("*Atkins II*"). Among the newly enacted Virginia provisions is a definition of mental retardation:

> "*Mentally retarded*" means a disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in conceptual, social and practical adaptive skills.

Va. Code Ann. § 19.2-264.3:1.1(A) (Michie 2004); *cf. Atkins I*, 536 U.S. at 308 n.3, 318 (noting that "clinical definitions of mental retardation require" both "subaverage intellectual functioning" and "significant limitations in adaptive skills").

The Supreme Court of Virginia has held that "[p]erformance on a standardized measure of intellectual functioning . . . at least two standard deviations below the mean" corresponds to an IQ score of 70 or below. *See Johnson v. Commonwealth*, 591 S.E.2d 47, 59 (Va. 2004); *see also* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 39 (4th ed. 1994) (hereinafter "DSM IV").[6]

---

[6]Under the Virginia statute, the Commissioner of Mental Health, Mental Retardation and Substance Abuse Services "shall maintain an exclusive list of standardized measures of intellectual functioning generally accepted by the field of psychological testing." Va. Code Ann. § 19.2-264.3:1.1(B)(1). Significantly, at all relevant times in this case, the Commissioner's list has included the Wechsler Adult Intelligence Scale-Revised ("WAIS-R"), which has been updated as the Wechsler Adult Intelligence Scale-Third Edition, *see Walton II*, 269 F. Supp. 2d at 695

The defendant bears the burden of proving that he is mentally retarded by a preponderance of the evidence. Va. Code Ann. § 19.2-264.3:1.1(C).

Thus, for a defendant to be considered mentally retarded under Virginia law, he must have "significantly subaverage intellectual functioning" and "significant limitations in adaptive behavior" (as statutorily defined), and both must originate before age 18.

### B.

The procedural posture of Walton's *Atkins* claim is very similar to the one we recently addressed in *Walker v. True*, 399 F.3d 315 (4th Cir. 2005). Like Walker, Walton's conviction and sentence became final before the Supreme Court issued its opinion in *Atkins I*. Like Walker, because Walton completed his direct appeal and state habeas proceedings before he could raise his *Atkins* claim, "his sole remedy" under Virginia law "lie[s] in federal court." Va. Code Ann. § 8.01-654.2 (Michie 2000 & Supp. 2004). Therefore, as in *Walker*, when considering Walton's habeas petition, the district court faced no state factual findings owed deference and, accordingly, "was obliged to assume all facts pleaded by [Walton] to be true" in resolving the Government's motion to dismiss the *Atkins* claim. *Walker*, 399 F.3d at 319 (internal quotation marks and citation omitted). But, as in *Walker*, the district court in the case at hand failed to do so.

Rather than assume the truth of the facts alleged in Walton's petition, the district court rejected Walton's *Atkins* claim because it found that Walton had "not forecast sufficient evidence to show that his alleged subaverage intellectual functioning originated before he was 18 years of age." *Walton II*, 269 F. Supp. 2d at 700. On appeal in this case, echoing its words in *Walker*, the Commonwealth acknowledges that the district court's order "dismissing" Walton's claim was actually "in the nature of a grant of summary judgment." *Compare* Brief

n.1; and the list now includes the General Ability Measure for Adults ("GAMA"), though it did not include it at the time of the district court's July 2, 2003 order dismissing Walton's claim of mental retardation. *See Walton II*, 269 F. Supp. 2d at 700 n.7.

of Respondent in *Walker* at 14 *with* Brief of Respondent in *Walton* at 22. But even if summary judgment was the correct procedure, which it was not, *see Walker*, 399 F.3d at 319 & n.1, the district court's ruling cannot stand because, as in *Walker*, the court resolved a factual dispute in favor of the Government. *See id.* at 319.

In rejecting Walton's *Atkins* claim, the district court relied on the results of two IQ tests administered to Walton around the time of his eighteenth birthday. The first, a WAIS-R administered to Walton at age seventeen years and eight months, purportedly gave him a full-scale IQ of 90, *Walton II*, 269 F. Supp. 2d at 694-95; the second, a WAIS-R administered to Walton at age eighteen years and five months, gave him a full-scale IQ of 77. *Id.* at 695. Walton alleges that neither score bars his claim, and that the score of 77 in fact supports it.

Specifically, with respect to the first IQ test, Walton maintains that there is "no way to determine the validity of that test" since Virginia has put forth no "raw data" from it. He contends that this first test "is not a test at all," but rather:

> a juvenile intake report which refers to scores on a purported test. There is no information about who administered the test, when it was administered, or what the testing conditions were when the test was given. There is no raw data for the test and no indication what protocols were to be followed and whether the standardized format of the test was adhered to in full or what accommodations or adjustments were made.

Brief of Petitioner at 61; *cf. Walker*, 399 F.3d at 323 (discussing petitioner's allegation that one of his IQ tests is "'highly unreliable for multiple reasons'"). If Walton can show that the IQ test he took when he was seventeen was not "administered in conformity with accepted professional practice," then, under Virginia law, it cannot be used to refute his alleged mental retardation. *See* Va. Code Ann. § 19.2-264.3:1.1(A).

Regarding the second test, Walton argues (much as Walker did with respect to an IQ score of 76) that when adjusted for the "Flynn

Effect" and the standard margin of error, his score of 77 actually supports his claim of mental retardation. Pursuant to the Flynn Effect, according to Walton, "as the age of an intelligence test moves farther from the date on which it is normed, the mean score of the population as a whole on that test increases." Reply Brief at 25. And, adjusted for the Flynn Effect, he contends, his IQ score of 77 "indicates a full-scale score of 74." Brief of Petitioner at 61. Ordinarily, of course, a score of 74 would not put Walton within the legal range of mental retardation in Virginia. But, like Walker, he further maintains that, after accounting for the standard five-point margin of error, his score of 74 falls within the required range. *See* Reply Brief at 21, 25-26 & n.11; *see also* DSM IV at 39 ("It should be noted that there is a measurement error of approximately 5 points in assessing IQ . . . .").[7]

Because the district court failed to consider Walton's contention as to the inadequacy of the first IQ test and the impact of the Flynn Effect or the standard margin of error on the second test, we must, as in *Walker*, vacate and remand for further proceedings.[8] On remand,

[7]At the June 16, 2003 hearing on the Commonwealth's motion to dismiss, Walton specifically represented to the court that, when adjusted for the Flynn Effect, and "with a standard error of measurement," his score of 77 "would be" as low as "69." In addition, in his reply in support of his habeas petition, filed before the June 16 hearing, Walton maintained that his score of 77 could support his claim: "Considering both the standard error of measurement ("SEM") and the impact of the date on which the particular test was normed to the general population, th[is] score[ ] support[s] Walton's claim that he has significantly subaverage intellectual functioning." The dissent questions the sufficiency of this allegation, asserting that "Walton never alleged, however, in his papers to the district court that the measurement error was five points." *Post* at 24. Given the extensive authority on the subject, it is of no consequence that Walton did not also state in his reply that the "standard error of measurement" is five points. *See*, *e.g.*, *Atkins*, 536 U.S. at 309 n.5 (noting that IQ score "between 70 and 75 or lower . . . is typically considered the cut-off"); DSM IV at 39 (noting that measurement error is "approximately 5 points in assessing IQ").

[8]Because the district court did not resolve Walton's contention that the *first* IQ test could not be used to evaluate his mental retardation because it was unreliable, the court did not determine the persuasiveness of the Flynn Effect evidence regarding Walton's *second* IQ test. Instead the court simply noted that the application of the Flynn Effect to the *first* test "would yield an IQ of 85, still substantially above the threshold of mental retardation." *Walton II*, 269 F. Supp.2d at 699 n.5.

the district court should determine the adequacy of the first test and the persuasiveness of Walton's Flynn Effect evidence as to the second test; if the court finds the Flynn Effect evidence persuasive, it should then determine whether the Virginia statute permits "consideration of measurement error in order to determine whether" Walton's purported score of 74 is "'two standard deviations below the mean.'" *Walker*, 399 F.3d at 323.

Walton also submitted evidence of two more recent IQ tests, both reporting scores below the cutoff for mental retardation. *See Walton II*, 269 F. Supp. 2d at 695 (noting August 9, 1999 WAIS-R reporting full-scale IQ of 69 and May 2003 GAMA reporting full-scale IQ of 66). We note that under the Virginia statute, "[a]ssessment of developmental origin shall be based on multiple sources of information generally accepted by the field of psychological testing and appropriate for the particular defendant being assessed, including, whenever available, educational, social service, medical records, prior disability assessments, parental or caregiver reports, and other collateral data." Va. Code Ann. § 19.2-264.3:1.1(B)(3). Thus, on remand, the district court may properly consider the scores from these tests, even though they were administered well after Walton's eighteenth birthday. *Cf. Walker*, 399 F.3d at 323 n.7.[9]

---

[9]The dissent makes much of the fact that Walton's petition, unlike Walker's, was "without the benefit of an expert assessment." *Post* at 25. This may factually distinguish *Walker*, but its holding controls here. *Walker* holds that the Flynn Effect, combined with the standard error of measurement, could render an IQ score "two standard deviations below the mean," and that allegations that rely on these scientific phenomena to bring a petitioner's IQ score within Virginia's standard for mental retardation (where there are no relevant state court findings of fact) suffice to entitle him to an evidentiary hearing. *Walker*, 399 F.3d at 322-23. Moreover, there is no requirement in Virginia law or elsewhere that expert testimony accompany a petition at this stage of the proceedings (although such testimony would no doubt be important in *proving* a claim of mental retardation). Rather, at this stage of the proceedings, Walton is required only to allege "facts that, if true, would entitle[ ] him to relief and establish[ ] one of six factors set out by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293 (1963)." *Walker*, 399 F.3d at 327 (internal quotation marks and citation omitted).

On remand the district court may have to consider Walton's "limitations in adaptive behavior" before age eighteen — another essential element of his claim. Because the court rejected Walton's *Atkins* claim due to his asserted failure to proffer sufficient evidence of mental retardation, the district court did not reach any conclusions as to this element. We note only that, as required by statute, Walton has set out a number of facts, which, if credited, tend to indicate significant limitations in adaptive behavior.

Walton would ordinarily not be entitled to an evidentiary hearing on remand because he has "failed to develop the factual basis of [his *Atkins*] claim in State court." 28 U.S.C. § 2254(e)(2)(2000). But because *Atkins* was decided after the denial of his direct appeal and state habeas petition became final, he cannot be held accountable for failure to raise this claim in state court. *See* Va. Code Ann. § 8.01-654.2 (providing that the "sole remedy" for people in Walton's position, who have "completed both a direct appeal and a habeas corpus proceeding" under Virginia law, "lie[s] in federal court"); *Walker*, 399 F.3d at 319, 326-27.

At the evidentiary hearing held on remand, the parties will have the opportunity to demonstrate the reliability *vel non* of Walton's first IQ test and the persuasiveness of other possible mental retardation evidence, including evidence as to the Flynn Effect, measurement error, other IQ tests, and adaptive behavior. We make no determination as to the validity of Walton's arguments on any of these points; we hold merely that Walton is entitled to be heard on them.

IV.

For the reasons set forth above, we vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*

SHEDD, Circuit Judge, dissenting:

I respectfully dissent. The district court's denial of habeas relief on Walton's mental retardation and insanity claims should be affirmed.

The district court properly dismissed Walton's mental retardation claim because Walton's habeas petition fails to state sufficient facts demonstrating that he is mentally retarded under Virginia law. Moreover, in deciding that Walton is competent to be executed, the district court applied the proper legal standard, and its findings of fact are not clearly erroneous.

I.

More than eight years ago, Walton murdered three people in the same neighborhood in Danville, Virginia, in two separate incidents.[1] Two of the victims were an elderly couple. While burglarizing their home, Walton shot both of them at close range in the top of the head. Walton murdered the other victim, a young man, in his home by shooting him above his left eye. Although the physical evidence alone overwhelmingly established Walton's guilt, Walton also admitted to several other jail inmates that he committed the murders and described the graphic details of the murders to his cellmate.

With the assistance of counsel, Walton pled guilty to all three murders, three counts of robbery, one count of burglary, and six counts of using a firearm in the commission of a felony. After determining that Walton would likely commit additional criminal acts and would be a continuing serious threat to society, the Danville Circuit Court sentenced Walton to death for the three murders.

Walton challenged his convictions on direct appeal, claiming, among other things, that the photographs of the victims as they were discovered should not have been admitted in the sentencing phase because they were too gruesome and that his sentence of death was excessive or disproportionate. The Virginia Supreme Court affirmed Walton's conviction and sentence. *Walton v. Commonwealth*, 501 S.E.2d 134 (Va. 1998). The United States Supreme Court denied Walton's petition for a writ of certiorari. *Walton v. Virginia*, 525 U.S. 1046 (1998).

---

[1]Walton was no stranger to crime before he murdered these three people. His prior convictions include burglary, grand larceny, resisting arrest, assault and battery on a police officer, juvenile possession of a firearm, and assault and battery.

Walton then filed a state habeas petition. Among the nine issues he raised, Walton claimed that he was incompetent to stand trial and plead guilty and that his lawyer was ineffective for failing to adequately raise his incompetency to the trial court. The Virginia Supreme Court denied Walton's habeas petition, *Walton v. Warden of Sussex I State Prison* (Aug. 9, 1999), and the United States Supreme Court denied Walton's petition for a writ of certiorari, *Walton v. Taylor*, 529 U.S. 1076 (2000).

The Danville Circuit Court scheduled Walton's execution for December 16, 1999. Three days before the scheduled execution, the district court stayed Walton's execution to allow him to file his first federal habeas petition. The district court held an evidentiary hearing on several of the claims, including Walton's assertion that his trial counsel was ineffective for failing to adequately raise his incompetency to the trial court. The district court denied this claim on the merits and denied Walton's habeas petition in its entirety. *Walton v. Angelone*, 2002 WL 467142 (W.D. Va. 2002) (unpublished).

Walton then sought a certificate of appealability from this court. As to Walton's claim that his counsel was ineffective for failing to adequately assert that he was mentally incompetent to stand trial or plead guilty during the trial court proceedings, we reviewed the extensive evidence regarding what Walton's counsel knew about Walton's mental state during the state trial court proceedings. In the trial court, Walton's counsel sought the appointment of a mental health professional to analyze Walton. The trial court appointed Dr. Stanton Samenow, a clinical psychologist. When Dr. Samenow raised concerns about Walton's intermittent odd behavior, the trial court appointed a second mental health professional, a forensic psychiatrist. Ultimately, both mental health professionals determined that Walton was competent to stand trial, *i.e.* that Walton understood precisely the charges against him, he knew that evidence was required to convict him, he was able to assist his lawyers in his own defense, and he realized that he could get the death penalty for his crimes. Based on this evidence and the fact that Walton had told at least two of his fellow inmates that he intended to "play crazy," Walton's counsel ultimately decided not to pursue further a claim that Walton was incompetent to stand trial or plead guilty. After reviewing this evidence, we denied Walton's certificate of appealability, concluding that reasonable jurists

would not "find the question of whether Walton was competent at the time of his guilty pleas and/or at the sentencing phase of the case 'debatable.'" *Walton v. Angelone*, 321 F.3d 442, 460 (4th Cir. 2003). The United States Supreme Court denied Walton's petition for a writ of certiorari. *Walton v. Johnson*, 539 U.S. 950 (2003).

Thereafter, the Danville Circuit Court rescheduled Walton's execution date for May 28, 2003. Just three days before this execution date, the district court granted Walton's second request for a stay of execution. A panel of this court granted Walton's request to file a successive habeas petition to allow him to claim for the first time that Virginia may not execute him because he is mentally retarded. In this second federal petition, Walton makes no further attack on his conviction. Walton's only remaining claims are that he cannot be executed because (1) he is mentally retarded and (2) he is insane. The district court dismissed Walton's mental retardation claim on the pleadings, *Walton v. Johnson*, 269 F. Supp. 2d 692 (W.D. Va. 2003), and denied relief on Walton's insanity claim after an extensive evidentiary hearing, *Walton v. Johnson*, 306 F. Supp. 2d 597 (W.D. Va. 2004). Walton now appeals.

II.

The majority vacates the district court's dismissal of Walton's mental retardation claim by concluding that the court failed to assume as true all the facts pleaded by Walton and instead resolved facts in favor of Virginia. By contrast, I would affirm because Walton fails to allege facts in his habeas petition demonstrating that he is mentally retarded under Virginia law.

As the majority correctly notes, the Supreme Court in *Atkins v. Virginia*, 536 U.S. 304, 317 (2002), left to the states the task of "developing appropriate ways to enforce the constitutional restriction" on executing the mentally retarded. Virginia responded by enacting its definition of "mental retardation" requiring, among other things, that the capital defendant's disability originate before the age of 18 and be characterized by "significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the

mean." VA. CODE ANN. § 19.2-264.3:1.1(A). The Virginia Supreme Court, consistent with the standards of the American Psychiatric Association, has determined that this standardized measure corresponds to an IQ score of 70 or less. *Johnson v. Commonwealth*, 591 S.E.2d 47, 59 (Va. 2004), *vacated on other grounds*, No. 03-10877, 2005 WL 516756 (U.S. Mar. 7, 2005). Thus, Walton is mentally retarded under Virginia law only if he establishes, among other requirements, that his intellectual functioning would have corresponded to an IQ score of 70 or less before he turned 18.[2]

A close review of Walton's habeas petition reveals that he fails to allege facts demonstrating that he is mentally retarded under Virginia law. Walton alleges that his IQ score in 1996, shortly before he turned 18, was 90. Although he claims that "[l]ittle is known" about how this testing was conducted and whether it can be considered reliable, Walton does not allege that this testing somehow tends to prove that he is mentally retarded, *i.e*, that his score on this test actually would have been 70 or less. Walton has the burden to allege facts entitling him to relief, and he cannot meet his burden simply by attempting to discredit the opposing evidence that shows that he is not mentally retarded. Walton also alleges that he received an IQ score of 77 when his trial expert, Dr. Samenow, tested him a few months after he turned 18. Although Dr. Samenow did not administer all of the verbal and performance tests available, Walton nevertheless admits that this shortcoming does not "invalidate" the final IQ score. Walton does allege, however, that this score of 77 should be reduced to a "true" score of 72 because it is possible that the "Flynn Effect" affected his

---

[2]This does not mean that a condemned inmate must submit a score of 70 or less from an IQ test taken before he turned 18. *Walker v. True*, 399 F.3d 315, 323 n.7 (4th Cir. 2005). Nevertheless, there must be some allegation that the inmate's intellectual functioning would have fallen below this standard before he turned 18. *See* VA. CODE ANN. § 19.2-264.3:1.1(A),(B)(3). For instance, evidence of an IQ test score below 70 taken after a condemned inmate reaches 18 may be sufficient if a mental health expert verifies that the inmate's intellectual functioning before he turned 18 would have been consistent with this qualifying test score. *See Atkins*, 536 U.S. at 309 n.5. In this case, however, none of the experts who assessed Walton opined that he is mentally retarded under Virginia's statutory definition.

score.[3] Accepting these allegations as true, Walton still does not state a claim that he is mentally retarded, because Virginia law requires a score of 70 or less before age 18.[4]

After Virginia filed its motion to dismiss Walton's habeas petition, Walton alleged for the first time in a separate filing that his test score of 77 supports his claim of mental retardation once the "standard error of measurement" is taken into account. Even assuming that the district court could consider this representation, which is not in his petition, Walton does not explain what this "standard error of measurement" is, much less how it could reduce his score to 70 or less. Walton can only speculate that the standard measurement error (which a mental health expert can invoke in some cases to either *raise or lower* a given IQ test score, *see id.* at 322) actually *lowered* his given score of 77 enough to meet Virginia's mental retardation standard. Such conclusory, speculative allegations do not preclude the court's dismissal of Walton's claim. *See United States v. Roane*, 378 F.3d 382, 400 (4th Cir. 2004) (concluding that speculative allegations in a habeas petition do not warrant giving the petitioner an evidentiary hearing to further pursue his claim). Accordingly, because Walton failed to specifically allege facts in his habeas petition demonstrating that his intellectual functioning was below the required level before he turned 18, the district court properly dismissed Walton's mental retardation claim.

The majority, nevertheless, concludes that Walton alleges sufficient facts that, if true, would entitle him to relief. Remarkably, the majority cites to representations in Walton's *appellate* briefs, not in

---

[3]On appeal, Walton indicates, without explanation, that the "Flynn Effect" would reduce his score of 77 to *74*, not *72*.

[4]Walton also alleges that he was tested two other times well after he turned 18 and that both test results are below 70. Although these test results are relevant to Walton's more current intellectual functioning, *see Walker*, 399 F.3d at 323 n.7, Walton does not allege that these scores demonstrate his intellectual functioning before he turned 18. In fact, the expert who gave the test on which Walton received his lowest score stated that she does not consider Walton to be mentally retarded. Thus, these two scores do not meet the developmental origin requirement of Virginia's mental retardation standard.

his filings to the district court, to find what it deems to be sufficient allegations of mental retardation. For instance, the majority credits Walton's representation on appeal that his test score of 77 qualifies based on the "Flynn Effect" and "the standard five-point margin of error." Walton never alleged, however, in his papers to the district court that the measurement error was five points.[5]

Even accepting as true Walton's conclusory allegations in his appellate briefs, upon which the majority improperly relies, these assertions do not satisfy Walton's burden of alleging that he is mentally retarded under Virginia law. Walton argues in his appellate brief that "it is *possible* to diagnose Mental Retardation in individuals with IQs between 70 and 75." Reply Brief at 21 (emphasis added). He also asserts that "[e]xpert analysis of the specific data is important." *Id*. What these arguments acknowledge is that a person with a score between 70 and 75 is at least as likely *not* to be mentally retarded as to be mentally retarded and that an expert must determine whether a

---

[5]In response, the majority states that a hearing transcript excerpt shows that Walton's counsel represented to the district court that his IQ score of 77 would be as low as 69. A review of this transcript, however, reveals that this statement by counsel is not sufficient to entitle Walton to relief. Counsel states that Walton's score of 77 would result in a score of 69 after fully taking into account the "Flynn Effect" and the five-point standard measurement error. As explained above, the standard measurement error does not automatically reduce a test score by five points. Instead, it is a *plus or minus* range that a mental health expert can use to either *reduce* or *increase* a test score after assessing a particular person. Although I agree that we can take judicial notice of the existence of the *plus or minus* five-point standard measurement error range, we cannot take judicial notice that a particular person is automatically entitled to a full five-point *reduction*. Without a proper basis for asserting that Walton's test score should be reduced by the full five points possible, the best Walton's counsel can competently represent is that Walton's score is somewhere between 69 and 79. Accordingly, for Walton's counsel to suggest that Walton's score would be 69 rather than 79 or some other number in between is nothing more than speculative opinion, not an allegation of fact. *See Roane*, 378 F.3d at 400. In fact, the only mental health expert who has specifically addressed whether the test score of 77 should be adjusted is Walton's trial expert, Dr. Samenow, who testified that Walton's score should probably be higher than 77.

test score between 70 and 75 should be adjusted downward or upward in any particular case. For Walton to allege, without the benefit of an expert assessment, that this score should be adjusted downward is mere speculation.[6] Thus, even had Walton made these allegations and arguments to the district court, the court properly would have dismissed his claim.

The majority suggests that this case is controlled by our recent opinion in *Walker v. True*, 399 F.3d 315 (4th Cir. 2005). In my view, there are significant differences between this case and *Walker*, and these differences reveal why the district court properly dismissed this case.

The condemned inmate in *Walker* scored 76 on an IQ test before he turned 18. Walker alleged that this score actually satisfied the intellectual functioning requirement of the Virginia mental retardation definition, because it actually represented a score of 70 or less after certain factors were taken into account. *Id.* at 320-22. Importantly, Walker supported these allegations in his petition with affidavits from mental health experts. These experts stated that Walker's score of 76 should be reduced to 72 based on the "Flynn Effect" and that it should be further reduced (rather than increased) below 70 based on the standard five-point measurement error. Based on their review of Walker's intellectual functioning and background, the experts opined that Walker was mentally retarded under Virginia law — his intellectual functioning measured below an IQ score of 70 before he turned 18. *Id.* at 322.

---

[6]It is implicit in the Virginia statute that mental retardation ordinarily cannot be diagnosed in a particular person without the assessment and opinion of a mental health expert. For example, the Virginia statute requires that "[a]ssessment of intellectual functioning shall include administration of at least one standardized measure *generally accepted by the field of psychological testing*." VA. CODE ANN. § 19.2-264.3:1.1(B)(1) (emphasis added). Also, determining whether the disability originated before 18 "shall be based on multiple sources of information *generally accepted by the field of psychological testing and appropriate for the particular defendant being assessed*." VA. CODE ANN. § 19.2-264.3:1.1(B)(3) (emphasis added).

Unlike the condemned inmate in *Walker*, Walton does not allege in his petition that his IQ test score of 77 should be reduced to 70 or less. Moreover, in his post-petition filings, Walton advances only speculative assertions. Walton has never supported any of his mental retardation allegations, as he is allowed to do in a habeas petition, *see* Rule 4, Rules Governing Section 2254 Cases in the United States District Courts (2003), with opinions from mental health experts.[7] Despite the fact that Walton has retained several highly qualified psychologists and psychiatrists, none of them has ever opined that this particular IQ test score of 77 supports his mental retardation claim. To the contrary, Walton's trial expert, Dr. Samenow, testified that Walton's test score of 77 "most likely is an *underestimate* of his intelligence." (Emphasis added). Moreover, while no mental health expert has ever opined that Walton is mentally retarded, Dr. Samenow testified that Walton is "certainly not retarded." Without some verification by an expert that Walton is mentally retarded, Walton's self-serving and speculative assertions fail to sufficiently allege that Walton is mentally retarded under Virginia law. Accordingly, the district court properly dismissed Walton's mental retardation claim.

## III.

The majority vacates the district court's dismissal of Walton's insanity claim by creating a new constitutional test for determining competence to be executed. I would affirm because the district court followed the proper test, and its findings of fact are not clearly erroneous.

The district court held two hearings on Walton's insanity claim. In the first hearing, the district court heard extensive testimony offered by both Walton and Virginia. Following this hearing, the district court decided to appoint Dr. Mark Mills, a forensic psychiatrist, to provide additional evidence relating to Walton's competence to be executed. After interviewing and assessing Walton, Dr. Mills testified at length at the second hearing. He explained that Walton was cooperative and able to volunteer important information at the beginning of the inter-

---

[7]Walton attached to his petition affidavits and reports from his mental health experts in support of his insanity claim but not his mental retardation claim.

view. For instance, Walton volunteered that he is in prison because he was convicted of killing three people. Walton also knows that he is going to be executed, but he prefers to live in prison the rest of his life rather than be executed. He considers death to be some kind of an end and believes that he will go to heaven and then return to earth. As the interview continued, Walton began responding to questions by immediately and repeatedly stating "I don't know, I just don't know." Dr. Mills explained that this response — which the majority suggests shows that Walton is not competent to be executed — is a sort of defense that Walton uses when he starts to lose focus or becomes irritated at continued questioning. Dr. Mills was able to get beyond this defense by asking Walton more structured questions. Based on his assessment, Dr. Mills testified that Walton understands that he is going to be executed and understands that he is going to be executed as punishment for murdering three individuals. In a thorough order, the district court determined that "Walton both understands that he is to be executed and that his execution is punishment for his conviction for murder." *Walton v. Johnson*, 306 F. Supp. 2d 597, 598 (W.D. Va. 2004).

Despite the district court's extensive hearings and careful findings, the majority concludes that *Ford v. Wainwright*, 477 U.S. 399 (1986) requires more. In my view, *Ford* necessitates that we affirm the district court's judgment.

The petitioner in *Ford*, a convicted murderer on Florida's death row, began exhibiting peculiar behavior after he had exhausted all of his direct and collateral appeals. Ford's lawyers retained a mental health expert to assess him. Ford told the expert that he was free to leave the prison whenever he wanted and that he could not be executed because he had won a landmark case invalidating the death penalty — representations that were obviously incorrect. That expert opined that Ford "had no understanding of why he was being executed [and] made no connection between the homicide of which he had been convicted and the death penalty." *Id.* at 403. Based on their expert's opinion, Ford's lawyers sought a reprieve from the death penalty based on his incompetence. Florida law prohibited — as it still does today — the execution of an inmate if he "does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him." Fla. Stat. Ann. § 922.07(3) (1985 & 2005).

The governor, who has sole authority to determine whether a death row inmate is competent to be executed, appointed three psychiatrists to assess Ford in the same 30-minute interview. All three of these state-appointed psychiatrists concluded that Ford was able "to understand the nature of the death penalty and the reasons why it was imposed upon him." *Ford*, 477 U.S. at 403-04. Although Ford's lawyers submitted the report of their psychiatrist who believed that Ford was incompetent, the governor did not accept that report for review. *Id.* at 413, 424. The governor denied Ford's request for relief without explanation and instead signed a death warrant. Ford filed a federal habeas petition, but the district court denied the petition *without a hearing*. *Id.* at 404.

In a fractured opinion, the five-member majority of the Supreme Court could agree on only three holdings: (1) the Eighth Amendment forbids the states from executing the insane, *id.* at 409-10, 419; (2) Florida's failure to consider the opposing view of Ford's psychiatrist violated his due process rights, *id.* at 413, 424; and (3) on remand, the district court was required to hold a hearing to consider all the evidence to determine whether Ford was competent to be executed, *id.* at 418, 424-25. It is important for purposes of our review to determine what the *Ford* majority did *not* decide. The majority did not decide that Florida's standard for determining incompetence to be executed, *i.e.*, whether the condemned inmate "does not have the mental capacity to understand the nature of the death penalty and why it was imposed on him," was an inadequate legal standard. Instead, the five-member majority decided that the Florida governor and the district court failed to give Ford a fair hearing by refusing to consider all the evidence that bore on the question of whether he was competent. The majority did not establish a new legal standard by which the district court on remand was to judge whether Ford was competent to be executed. To the contrary, the four-member plurality recognized that Florida's statute properly did not permit the execution of the insane. *Id.* at 408-09 n.2. Its concern was not with the incompetency standard established in the Florida statute but rather with the district court's failure to consider Ford's evidence demonstrating his alleged insanity. In concurrence, Justice Powell agreed, stating:

> [Ford's] claim of insanity plainly fits within [the proper] standard. According to [Ford's] proffered psychiatric exami-

> nation, [Ford] does not know that he is to be executed, but rather believes that the death penalty has been invalidated. If this assessment is correct, [Ford] cannot connect his execution to the crime for which he was convicted. Thus, *the question is whether [Ford's] evidence entitles him to a hearing in Federal District Court on his claim.*

*Id.* at 422-23 (emphasis added) (internal citations omitted).

In this case, it is clear that the district court provided Walton all the process he was due under *Ford*. Whereas in *Ford* the petitioner was provided no hearing and the governor and the district court failed to consider Ford's evidence demonstrating his alleged incompetence, the district court in this case held two hearings and considered all the evidence presented by Walton. Not content with the extent of the evidence before it, the district court appointed a neutral expert, Dr. Mills, to further assess Walton's competence. Dr. Mills corroborated the opinion of Virginia's expert that Walton is indeed competent to be executed. After its thorough review, the district court found Dr. Mills' testimony to be particularly persuasive and determined that Walton is competent to be executed. *Walton*, 306 F. Supp. 2d at 601.[8] Because

---

[8]The majority suggests that the district court in the March 2004 hearing improperly limited Walton's counsel to asking the expert witnesses specifically whether Walton understood that he was to be executed for killing three people. Contrary to what the majority suggests, the district court prevented Walton's counsel only from asking Dr. Mills his impressions of the district court's interpretation of the *Ford* legal standard, a clearly improper line of questioning. The district court otherwise permitted Walton's counsel to question the experts on a wide range of factual topics, including whether they believe Walton is able to prepare for his death. Although Dr. Mills testified that he did not believe that Walton would prepare for his passing, that belief did not affect his firm opinion that Walton understood that he was going to be executed for killing three people. Walton's counsel was also allowed to ask his retained expert whether he thought Walton could prepare for his death. The expert could only manage that he "would have some difficulty answering" that question but thought that Walton would probably not be able to say goodbye to people, turn off emotional relations, or make arrangements to dispose of his property. Thus, the district court did not improperly limit the evidence at the hearing.

the district court's findings of fact are not clearly erroneous, I would affirm its judgment. *See Mickens v. Taylor*, 240 F.3d 348, 360 (4th Cir. 2001) (stating that the district court's findings of fact in a § 2255 proceeding are subject to the clearly erroneous standard set forth in Fed. R. Civ. P. 52(a)).

The majority in this case, nevertheless, insists that *Ford* requires still more. According to the majority, *Ford* pronounces the substantive test that states must use to determine whether a condemned inmate is competent to be executed. This holding is at odds with the majority's earlier correct acknowledgment that the Court in *Ford* "did not define insanity or mandate procedures that courts must follow in determining whether a defendant is insane [but instead] left those tasks to the states." Even more remarkably, the majority in this case insists that *Ford*'s purported substantive legal test includes a prong that no other court interpreting *Ford* has ever required. According to the majority's new test, a condemned inmate cannot be executed unless he is able to "prepare for his passing."[9]

This new prong is simply not part of the *Ford* holding. *Ford*'s four-member plurality did not create a new definition of insanity different from the test required in the Florida statute. Instead, the plurality focused primarily on the process necessary to make an insanity determination. The *Ford* plurality explained that the reason it was deciding the substantive Eighth Amendment issue was to determine whether the *procedures* Florida followed in Ford's case were adequate. *Ford*, 477 U.S. at 405 (stating that the "adequacy of the *procedures* chosen by a State to determine sanity, therefore, will depend upon . . . whether the Constitution places a substantive restriction on the State's power to take the life of an insane prisoner" (emphasis added)). To underscore this point, Justice Powell in his concurrence correctly recognized that the plurality did not address the "meaning of insanity" in the context of competence to be executed. *Id.* at 418.

The majority in this case, nevertheless, cobbles together stray dicta from *Ford* to suggest that the Court held that the proper substantive

---

[9]Although I disagree with the majority's creating this new prong, I agree with its separate holding that *Ford* does not require a condemned inmate to be able to assist his counsel to be competent to be executed.

test for determining competence to be executed requires consideration of whether the condemned inmate is able to prepare for his passing. This holding is not mandated by the plurality opinion, nor is it fairly implied by Justice Powell's concurrence.[10] In fact, the *Ford* plurality does not establish a standard for insanity, and Justice Powell's concurrence — the only place the proper legal standard is explicitly addressed — adopted a two-prong test comparable to the Florida statutory standard. Justice Powell plainly stated: "Accordingly, I would hold that the Eighth Amendment forbids the execution *only* of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422 (emphasis added).[11]

None of the four other circuits that have addressed the issue of competency to be executed has held that *Ford* requires states to determine whether a condemned inmate is able to "prepare for his passing." To the contrary, all these circuits have recognized Justice Powell's proffered holding — which is essentially the same test Florida followed in 1985 and continues to follow today — as an appropriate standard by which to determine competence. *See Massie v. Woodford*, 244 F.3d 1192, 1195 n.1 (9th Cir. 2001) (citing *Ford* for the proposition that "the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it"); *Coe v. Bell*, 209 F.3d 815, 826 (6th Cir. 2000) (concluding that "Justice Powell's standard, that 'only those who are unaware of the punishment they are about to suffer and the reason they are to suffer it are entitled to a reprieve,' satisfies due

---

[10]The majority complains that I refuse to recognize which parts of *Ford* make up the opinion of the Court. The majority is simply mistaken. We do not disagree over which parts of *Ford* are agreed to by five members of the Court. Instead, we disagree over how to interpret the holding of the Court's opinion. As explained below, my interpretation of the holding of *Ford* is consistent with the four other circuits that have addressed the issue. The majority's interpretation, which creates a new prong of the incompetence test, stands alone.

[11]After proffering this precise standard, Justice Powell acknowledged that it is the same as Florida's standard: "[Ford] concedes that the Governor of Florida has determined that he is not insane under the standard prescribed by Florida's statute, *which is the same as the standard just described*." *Id.* at 423 (emphasis added).

process"); *Barnard v. Collins*, 13 F.3d 871, 876 (5th Cir. 1994) (recognizing the "*Ford* standard, i.e., that a prisoner must understand the fact of his impending execution and the reason for it"); *Rector v. Clark*, 923 F.2d 570, 572 (8th Cir. 1991) (stating that "according to *Ford*, we must examine two factors in assessing petitioner's competency to be executed: (1) whether petitioner understands that he is to be punished by execution; and (2) whether petitioner understands why he is being punished"). I agree with these circuits that the *Ford* test does not require a state to determine whether an inmate is able to "prepare for his passing" when deciding his competence to be executed.[12]

The majority's new competence test suffers not only from a faulty legal basis but also from vagueness. The majority seems to recognize this problem by its failure to provide any sort of guidance as to what a state or court must do or consider in deciding whether an inmate is able to prepare for his passing. Moreover, even if *Ford* could be read to add this new requirement (which it cannot), this third prong is so open-ended and controlled by the inmate that courts might never find that it is met. Requiring this new prong effectively precludes capital punishment for any condemned inmate who even raises a claim of insanity.

In this case, the district court followed the proper test to determine whether Walton is competent to be executed.[13] The court considered all the evidence presented by both sides and also appointed an additional psychiatrist to assess Walton. Based on its review of the evidence, the district court determined that Walton understands that he is to be executed for murdering three individuals. The district court

---

[12]Importantly, the Supreme Court — albeit in dicta — has also recognized Justice Powell's two-part test in *Ford* as a proper standard by which to determine whether a person is competent to be executed. *Penry v. Lynaugh*, 492 U.S. 302, 333 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002).

[13]The issue before this court is not whether it would be wise to expand the *Ford* test to include new factors, including whether a condemned inmate must be able to prepare for his passing. The issue that we must decide is what *Ford* mandates. The Supreme Court is, of course, free to expand the test if it decides that a different standard is constitutionally required.

afforded Walton all the protections constitutionally required, and I would affirm the district court's judgment that Walton is competent to be executed.

## IV.

I would affirm the district court's judgment denying Walton's habeas corpus petition on both his mental retardation and insanity claims.