**Percy Levar WALTON, Petitioner,**

v.

**Gene JOHNSON, Director Virginia Department of Corrections, Respondent.**

**No. CIV.A. 7:03CV00347.**

United States District Court, W.D. Virginia, Roanoke Division.

July 2, 2003.

Jennifer L. Givens, Virginia Capital Representation Resource Center, Charlottesville, VA, for Petitioner.

Robert Q. Harris, Office of Attorney General, Richmond, VA, for Respondent.

## MEMORANDUM OPINION

WILSON, Chief Judge.

This is an authorized successive petition by Percy Levar Walton for a writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in which Walton maintains that his sentence of death for three counts of capital murder would be cruel and unusual punishment because he is mentally retarded and because he is incompetent. The court finds that Walton is not mentally retarded under Virginia's definition of mental retardation which, like the American Psychiatric Association and the American Association of Mental Retardation's definition of mental retardation, requires an onset before age 18, and that Virginia's statute does not constitutionally under-define mental retardation. The court also finds, however, sufficiently conflicting evidence to warrant an evidentiary hearing on the question of whether Walton has become incompetent to be executed. Accordingly, the court will dismiss his mental retardation claim and hold a hearing on his incompetency claim.

### I.

### A. Factual History

In November of 1996, Walton murdered three of his neighbors in Danville, Virginia. He was arrested shortly after and charged with three counts of capital murder. Throughout the criminal proceedings, Walton's mental state was an issue. The trial court appointed Dr. Stanton Samenow, a mental health expert, to assist Walton in his defense. Dr. Samenow initially reported that Walton was competent to stand trial, but several months later he became concerned about Walton's mental health and recommended hospitalization. The trial court ordered another mental health expert, Dr. Miller Ryans, to determine whether Walton was competent to stand trial. Dr. Ryans examined Walton and concluded that he was competent to stand trial. Walton later pleaded guilty to all counts and was sentenced to death. During presentation of mitigating evidence at sentencing, Walton did not argue that he was mentally retarded.

Questions about Walton's mental health were also raised in Walton's state habeas petition and in his first habeas petition before this court. However, Walton's experts attributed his mental and behavioral problems to a mental illness-schizophrenia-and not to mental retardation. In fact, the record indicates that of all the mental health experts that have submitted affidavits or testimony about Walton's mental health in his earlier proceedings-including at trial, on direct appeal, in Walton's state habeas and in his first federal habeas-no expert ever suggested that Walton was mentally retarded.

In terms of Walton's childhood and school history, the record shows that Walton reached the tenth grade in the same academic program as other students, although he initially failed first grade and fourth grade and was required to repeat those grades. There is no evidence that Walton was ever enrolled in a special education program or other remedial class for mentally retarded students. Walton received a number of failing grades in elementary school and high school, but he also received many passing grades including at least one "B" grade in a reading and writing course. Walton did not advance to eleventh grade because in the summer following his tenth grade year he was adjudicated as a juvenile offender and placed in a juvenile detention facility. An examination of Walton by a state psychologist after his arrival in juvenile detention attributed Walton's poor school performance to a lack of motivation. (Resp't ex. B at 3)

In June 1996, when Walton was 17 years and 8 months old, the Commonwealth's Juvenile Reception and Diagnostic Center evaluated Walton and administered the

Wechsler Adult Intelligence Scale—Revised (WAIS–R)[1] IQ test. The WAIS–R test is considered the "gold standard" IQ test. Walton achieved a verbal IQ of 86, a performance IQ of 96 and a full-scale IQ of 90. Walton's full-scale IQ score of 90 placed him in the "average" range of intelligence. (Resp't. ex. B at 3)

On March 14, 1997, when Walton was 18 years and 5 months old, Dr. Stanton Samenow, Walton's court-appointed defense psychologist, again gave Walton the WAIS–R intelligence test. Walton achieved a verbal IQ of 71, a performance IQ of 89 and a full-scale IQ of 77. (Resp't ex. C) This court heard testimony from Dr. Samenow at Walton's first federal habeas proceeding on May 16, 2001. When asked about Walton's IQ test results, Dr. Samenow testified:

> [H]e's definitely not retarded. He's not dull normal. Low, very low average. But then again, for a person who rejected academic endeavors in school, which he largely did, that too can affect an IQ score. So in other words, what I'm saying here is that this full scale IQ of 77 most likely is an underestimate of his intelligence.

(Habeas Tr. at 118).

Since Walton's eighteenth birthday, he has been given at least two other intelligence tests. On August 9, 1999, Walton was again given the WAIS–R test through the Medical College of Virginia as part of a neuropsychological evaluation. Walton achieved a verbal IQ of 66, a performance IQ of 74 and a full-scale IQ of 69. The evaluation report attributed Walton's poor scores to "a psychotic disorder and dementia." The report did not mention mental retardation as a source of the poor test results. (Pet.app.27)

In May 2003, after his execution had been scheduled, Dr. Patricia General, a prison psychiatrist, gave Walton a "GAMA" test. Walton scored a 66 on the GAMA test-a result considered "well below average." Dr. General noted that, based solely on the results of the GAMA test, Walton appeared mentally retarded. Later, however, Dr. General further noted that the GAMA test is not considered the "gold standard" of IQ tests, and that the GAMA test cannot be relied on to determine whether Walton is mentally retarded. After reviewing Walton's previous "gold standard" WAIS–R tests, Dr. General opined "with a reasonable degree of medical certainty that [Walton] is not mentally retarded." (Resp't ex. H) Dr. General also noted that the "GAMA" test is the only intelligence test available to prison staff at Sussex I State Prison, where Walton was housed at the time. The test is used only for screening purposes. (Resp't ex. H)

## B. Procedural History

On October 7, 1997, in the Circuit Court for the City of Danville, Virginia, Walton pled guilty to three counts of capital murder. The Circuit Court found Walton to be a continuing threat to society and imposed three death sentences.

On November 25, 1997, Walton appealed the convictions to the Supreme Court of Virginia. That court denied his appeal on all grounds. *Walton v. Virginia,* 256 Va. 85, 501 S.E.2d 134 (1998) The Supreme Court of the United States denied Walton's petition for writ of certiorari. *Walton v. Virginia,* 525 U.S. 1046, 119 S.Ct. 602, 142 L.Ed.2d 544 (1998).

On February 5, 1999, Walton filed a petition for writ of habeas corpus in the

---

**1.** The WAIS–R has since been updated and is now called the Wechsler Adult Intelligence Scale—Third Edition (WAIS–III).

Supreme Court of Virginia. After filing his petition, Walton filed a motion asking the court to hear his claim that he was incompetent to be executed under *Ford v. Wainwright*-a claim that he neglected to include in his written submissions. Walton also asked the court to appoint a mental health expert to examine him. The court denied Walton's motions and dismissed his habeas petition. Walton filed a petition for rehearing, attaching affidavits from mental health experts. On November 5, 1999, the Supreme Court of Virginia denied rehearing.

On March 24, 2000, Walton filed a habeas petition in this court. Among other claims, Walton claimed that he was not competent to plead guilty, that his trial counsel was ineffective, and that he was not competent to be executed. The court granted an evidentiary hearing on the questions of Walton's competency to plead guilty and the adequacy of his representation at trial. After hearing evidence from Walton and the Commonwealth, the court found that Walton's trial counsel was not ineffective and that Walton had procedurally defaulted his claim that he was not competent to plead guilty. The court declined to address Walton's claim that he was not competent to be executed because Walton's execution was not yet imminent. *Walton v. Angelone,* No. 7:99CV00940, 2002 WL 467142 (W.D.Va. Mar 27, 2002)

On February 27, 2003, the United States Court of Appeals for the Fourth Circuit affirmed the court's ruling. *Walton v. Angelone,* 321 F.3d 442 (4th Cir.2003). The Supreme Court denied Walton's petition for writ of certiorari. *Walton v. Johnson,* — U.S. ——, 123 S.Ct. 2626, 156 L.Ed.2d 642 (2003).

On May 23, 2003, the Fourth Circuit authorized Walton to file a successive petition on the question of whether Walton's execution was barred because he is mentally retarded. On June 2, 2003, Walton

filed this petition for writ of habeas corpus, alleging three claims: (1) that his execution is barred because he is mentally retarded (2) that his execution is barred because he is incompetent, and (3) that he is not competent to choose his method of execution.

■ Walton's first claim is authorized as a successive habeas claim by the Fourth Circuit. Additionally, although this claim has not been raised in a state habeas proceeding, there is no issue of exhaustion because there is no available state process for raising the claim. A recently-enacted Virginia statute provides that, when a defendant has already completed both direct state appeal and a state habeas corpus proceeding, the defendant is not entitled to further state habeas proceedings on the question of mental retardation and "his sole remedy shall lie in federal court." 2003 Va. Acts ch. 1040 (May 1, 2003) (enacting Va.Code § 8.01–654.2). Thus, because Walton has exhausted his direct state appeal and one state habeas proceeding, he is not entitled to further state postconviction relief, and this court may properly hear this federal habeas claim. 28 U.S.C. § 2254(b)(1).

■ Walton's second claim is also properly before the court because the court dismissed it as unripe in Walton's first federal habeas petition. If a District Court dismisses a claim of competency to be executed as unripe, the petitioner may reinstate the claim when it becomes ripe without obtaining authorization for a successive petition from the Court of Appeals. *Stewart v. Martinez–Villareal,* 523 U.S. 637, 645–646, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998).

Walton's third claim has not been authorized by the Fourth Circuit. Walton argues that his third claim is not a successive claim because it is not attacking the judgment that was the subject of Walton's first

habeas petition. For the reasons detailed below, the court will reserve judgment on the question of whether Walton's third claim is successive until after the evidentiary hearing.

## II.

Walton first claims that his execution is barred because he is mentally retarded. On June 20, 2002, the Supreme Court of the United States decided *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). In *Atkins*, the Court ruled that imposing the death penalty on mentally retarded defendants violates the Eighth Amendment.

The Court based its reasoning primarily on the emerging "consensus" among the states that executing mentally retarded defendants should be prohibited. *Id.* at 316–317, 122 S.Ct. 2242. Noting that the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a mature society," the court found that the legislative trend toward prohibiting execution of the mentally retarded indicated a national consensus not present when the court last considered the issue in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).[2] *Atkins*, 536 U.S. at 311–312, 122 S.Ct. 2242.

The court also found that the mentally retarded are not as culpable for their actions because of their limited ability "to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others." *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242. Thus, the Court reasoned, imposing the death penalty on a mentally retarded defendant would not advance the punishment's two principal social purposes: retribution and deterrence. *Id.* at 319, 122 S.Ct. 2242. Equally important to the Court was the danger that a mentally retarded defendant would be more susceptible to making a false confession, and less able to assist in presenting mitigating evidence during sentencing. *Id.* at 320, 122 S.Ct. 2242.

Although the Court ruled that executing the mentally retarded violated the Eighth Amendment, it noted that "not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* at 317, 122 S.Ct. 2242. The Court expressly left to the states the "task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Id.* at 317, 122 S.Ct. 2242.

▮▮ After the Supreme Court decided *Atkins*, the Virginia legislature passed a statute defining mental retardation and providing a procedural process for raising claims of mental retardation in capital cases. 2003 Va. Acts ch. 1040 (May 1, 2003) (enacting Va.Code § 19.2–264.3:1). Under the Virginia statute, "mentally retarded" is defined as:

[A] disability, originating before the age of 18 years, characterized concurrently by (i) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean and (ii) significant limitations in adaptive behavior as expressed in all of the following: con-

---

**2.** In addition to considering the trend among the states, the court also found evidence of the emerging national consensus in opinion polls, the positions of organizations such as the American Psychological Associations and the American Association of Mental Retardation, and the positions of religious organizations and nations in Western Europe. *Atkins*, 536 U.S. at 316 n. 21, 122 S.Ct. 2242.

ceptual adaptive skills, social adaptive skills and practical adaptive skills

2003 Va. Acts ch. 1040 (enacting Va.Code § 19.2–264.3:1.1(C)). Therefore, there are three tests that must be satisfied before a defendant can be considered mentally retarded under Virginia law for death penalty purposes. First, the defendant must have "significantly subaverage intellectual functioning" as defined in the statute. Second, the defendant must have "significant limitations in adaptive behavior" as defined in the statute. Finally, these two factors must be present before the defendant reaches 18 years of age. The defendant has the burden of proving these factors by a preponderance of the evidence.[3]

**3.** Walton argues that *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) require as a matter of constitutional law that the question of mental retardation be determined by a jury. This argument fails because the determination of mental retardation does not increase the penalty for the crime beyond the prescribed statutory maximum and thus it is not the equivalent of an element of the offense for *Apprendi* purposes. Rather, a finding of mental retardation precludes the state from carrying out the death sentence. Thus, it is analogous to the question of competency to be executed in death penalty cases, which need not be decided by a jury. *See Ford v. Wainwright*, 477 U.S. 399, 426, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (Powell, J., concurring). *See also Medina v. California*, 505 U.S. 437, 446, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992).

Furthermore, the Virginia statute governing mental retardation in death penalty cases does not treat the lack of mental retardation as an element of the offense. The statute specifically places the burden of proving these factors on the defendant by a preponderance of the evidence. The statute does, however, provide that the sentencing jury must determine the question of mental retardation when the case is tried before a jury. When the case is tried before a judge or when the defendant pleads guilty, the trial judge is to determine the question at sentencing. 2003 Va. Acts ch. 1040 (enacting Va.Code § 19.2–264.3:1.1(C)).

With respect to whether the factors developed before the age of 18, the statute provides that:

> Assessment of developmental origin shall be based on multiple sources of information generally accepted by the field of psychological testing and appropriate for the particular defendant being assessed, including, whenever available, educational, social service, medical records, prior disability assessments, parental or caregiver reports, and other collateral data, recognizing that valid clinical assessment conducted during the defendant's childhood may not have conformed to current practice standards.

In deciding *Atkins* on remand from the Supreme Court of the United States, the Supreme Court of Virginia followed this statute in holding that:

> Because Atkins first presented his claim to this Court on direct appeal from the resentencing hearing and the case is now being remanded to the circuit court where the sentence of death was imposed by a jury, "the circuit court shall empanel a new jury for the sole purpose of making a determination of mental retardation."

*Atkins v. Virginia*, 266 Va. 73, 581 S.E.2d 514 (2003). The procedural provisions of the statute cited by the Supreme Court of Virginia do not apply to this proceeding, however. First, the language requiring a jury trial on the question of mental retardation applies only where the mental retardation issue was "raised by the defendant" at trial in a case "tried before a jury." 2003 Va. Acts ch. 1040 (enacting Va.Code § 19.2–264.3:1.1(C)). More importantly, however, these provisions creates a procedure for cases in the "pipeline" of the state system-either at sentencing, on direct appeal or in a first state habeas petition. The provisions do not provide a procedure for this court to follow on federal habeas review. In this circumstance, the Virginia statute provides only that the petitioner's "sole remedy shall lie in federal court." Thus, the Virginia legislature has not afforded defendants whose claims are no longer in the state procedural pipeline an opportunity to have the question determined by a state jury or judge.

2003 Va. Acts ch. 1040 (enacting Va.Code § 19.2–264.3:1.1(B)(1)). This requirement is consistent with the "national consensus" on the issue of mental retardation.[4] As noted in *Atkins*, both the American Association of Mental Retardation and the American Psychiatric Association define mental retardation as a mental disability whose onset occurs before age 18. *Atkins*, 536 U.S. at 308 n. 3, 122 S.Ct. 2242. A majority of states also have defined mental retardation to require onset before age 18. *See* Brief of Amici Curiae States of Alabama, Mississippi, Nevada, South Carolina, and Utah at 7–14, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (No. 00–8452).

■ After reviewing the record, the court finds that Walton has not produced sufficient evidence to warrant a hearing on the question of whether he had significantly subaverage intellectual functioning before the age of 18. The only quantitative measure of Walton's intellectual functioning before the age of 18 is the WAIS–R test administered at the Juvenile Reception and Diagnostic Center. Walton achieved a verbal IQ of 86, a performance IQ of 96 and a full-scale IQ of 90 on that examination. Walton's full-scale IQ of 90

placed him in the "average" range of intelligence, well above the mental retardation range.

Five months after his eighteenth birthday, Dr. Samenow again gave Walton the WAIS–R test. Walton achieved a verbal IQ of 71, a performance IQ of 89 and a full-scale IQ of 77. This result placed Walton in the "low" or "very low average" intelligence range, but not in the mental retardation range. Dr. Samenow stated at this court's earlier hearing that the results of the WAIS–R indicated that Walton was "definitely not retarded" and that the "full scale IQ of 77 most likely is an underestimate of his intelligence." (Habeas Tr. at 118). Thus, shortly before and shortly after Walton's eighteenth birthday, tests of Walton's intellectual functioning showed no indication of "significantly subaverage intellectual functioning.[5]"

The anecdotal evidence of Walton's intellectual functioning before the age of 18 does not contradict the results of the standardized testing. Although there is evidence that Walton failed two grades during elementary school, he advanced to tenth grade taking the same academic classes as other students. Walton scored passing grades, and at least one "B" in some reading and writing classes. There

---

**4.** Although *Atkins* left to the states the task of developing a definition of mental retardation, that definition is limited under *Atkins* because it must be consistent with the emerging national consensus and evolving standards of decency described in the Supreme Court's opinion. *Atkins*, 536 U.S. at 317, 122 S.Ct. 2242.

**5.** Walton argues that his scores on the WAIS–R tests are an overestimate of his actual intelligence as a result of a theory known as the "Flynn Effect." The Flynn Effect refers to the phenomenon or perhaps paradox of rising IQs discovered by the researched James Flynn in 1987. Flynn observed that every time IQ test scores were renormed, the raw data indicated that a substantial increase in IQ had occurred in the general population since the

last time the test was normed. IQ tests are generally renormed every 15–20 years. From these results, two competing theories emerged. Some experts concluded that IQ tests become less accurate over time, and can eventually greatly overstate a person's actual IQ. Other experts draw the opposite conclusion-that over time, IQ among the general population is increasing, due largely to environmental factors such as better nutrition, improved education and increased access to information. The court notes that, even if it applied Walton's interpretation of the Flynn Effect to his IQ test results, Walton's score on his only intelligence test taken before his eighteenth birthday would yield an IQ of 85, still substantially above the threshold of mental retardation.

is no evidence that Walton was enrolled in any special education programs or other remedial programs for mentally retarded students. Walton did not complete high school because he was adjudicated as a juvenile offender and placed in a juvenile detention facility.

Additionally, although Walton's experts believe his poor school performance is attributable to poor intellectual functioning, a psychologist at the Juvenile Reception and Diagnostic Center, who examined Walton on a date close to Walton's eighteenth birthday, opined that Walton's poor performance in school resulted from a lack of motivation. The psychologist's opinion was supported by Walton's poor performance on portions of the intellectual testing that relied on education and his comparatively higher scores on those portions that are not affected by direct education. (Resp't ex. B at 3) Dr. Samenow also testified that Walton "rejected academic endeavors in school." (Habeas tr. 118)

 In a habeas corpus proceeding, a district court may not grant an evidentiary hearing to a habeas petitioner if the petitioner "failed to develop the factual basis of a claim" in state court. 28 U.S.C. § 2254(e)(2). Here, however, § 2254(e)(2) does not bar an evidentiary hearing because this claim involves "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable." § 2254(e)(2). "But, even though section 2254(e)(2) presents no bar to a hearing, an evidentiary hearing is not automatic." *Fullwood v. Lee*, 290 F.3d 663, 681 (4th

Cir.2002). The fact that Walton's claim "is not precluded by § 2254(e)(2) ... does not mean he *is* entitled to an evidentiary hearing-only that he *may* be." *Id.* (emphasis in original). In determining whether to grant an evidentiary hearing, the court looks to the six factors in *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).[6] *See Fullwood*, 290 F.3d at 681. The court has thoroughly reviewed Walton's evidence in support of his mental retardation claim, including the affidavits of Walton's experts, his prison records and evidence of Walton's developmental history. In sum, the court finds that Walton has not produced sufficient evidence to warrant an evidentiary hearing on the question of mental retardation.

First, although Walton cites several recent intelligence tests as evidence of his poor intellectual functioning, the two intelligence tests taken shortly before and after Walton's eighteenth birthday indicate that he is not retarded. Second, while Walton presents some anecdotal evidence of his difficulty in school, the evidence also shows that Walton successfully worked his way to tenth grade in a normal academic setting with other students. Beyond this limited evidence of poor academic performance, Walton has not forecast any evidence of sufficient force to overcome the highly probative intelligence test results that bookend his eighteenth birthday. Therefore, because Walton has not forecast sufficient evidence to show that his alleged subaverage intellectual functioning originated before he was 18 years of age-a necessary element of his claim of relief-there is no need for an evidentiary hearing.[7] Walton

---

**6.** The Townsend factors are: (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evi-

dence; (5) the material facts were not adequately developed at the state court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing. *Townsend*, 372 U.S. at 312, 83 S.Ct. 745.

**7.** The court also notes that the results of the GAMA test relied on heavily by Walton cannot

has not satisfied the statutory definition of mental retardation under Virginia law and his habeas claim on mental retardation grounds must be denied.

### III.

■ Walton next claims that his execution is barred because he is not competent to be executed. In *Ford v. Wainwright,* 477 U.S. 399, 409–410, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), the Supreme Court of the United States ruled that the Eighth Amendment prohibits execution of a defendant who is incompetent. The Court did not define incompetence in the majority opinion, however, but instead left to the states "the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." *Id.* at 416, 106 S.Ct. 2595. Following *Ford,* some states adopted statutory schemes to govern the determination of mental competency in death penalty cases. Virginia, however, has not adopted a statutory definition of competency for use in death penalty cases. Therefore, the court follows the standard described in Justice Powell's concurrence in *Ford.* According to Justice Powell, "the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are about to suffer it." *Id.* at 422, 106 S.Ct. 2595 (Powell, J., concurring).

[9] The court has thoroughly reviewed the submissions of the parties, and finds that there is sufficient conflicting evidence to warrant an evidentiary hearing on this issue. According to affidavit's from Walton's experts, Walton suffers from a "psychotic illness" that has deteriorated significantly since 1999. Walton's experts claim that his illness prevents him from understanding that he has been found guilty of murder and prevents him from understanding "the nature of the punishment he is to suffer." The Commonwealth disputes the methodology and conclusions of Walton's experts, however, and presents its own expert evidence that Walton is not psychotic or otherwise mentally ill and "clearly understands that he is to be executed because he was convicted of murder."

The court concludes that Walton's allegations of incompetency, if true, would entitle Walton to relief under *Ford v. Wainwright.* Moreover, Walton has satisfied *at least* one of *Townsend's* six factors because there are no state court findings on Walton's competency to be executed and there is an allegation that Walton's mental condition has deteriorated significantly since his earlier habeas proceedings. *Townsend,* 372 U.S. at 312, 83 S.Ct. 745. Accordingly, this court will hold an evidentiary hearing on the question of whether Walton is competent to be executed under *Ford v. Wainwright.*

### IV.

■ Finally, Walton claims that he is not competent to choose his method of execution. Under Virginia Code § 53.1–

---

be used to meet the significantly subaverage intellectual functioning test under Virginia law. First, the GAMA test is used by prison staff as a "screening device." It is not intended as a substitute for the WAIS–III test, which is the "gold standard" test for intellectual functioning. More importantly, the Virginia statute governing mental retardation in death penalty cases provides that the Department of Mental Health, Mental Retardation and Substance Abuse Services "shall maintain an ex-

clusive list of standardized measures of intellectual functioning generally accepted by the field of psychological testing." The Department recognizes four standardized tests of intellectual functioning, including WAIS–III. The GAMA test is not recognized by the Department. (Resp't ex. I). Thus, the results of the GAMA test cannot be used to satisfy the standardized testing requirements of the Virginia statute.

234, a prisoner must choose his method of execution at least 15 days prior to his scheduled execution date. Walton has apparently selected electrocution as his method of execution. The court finds that the question of Walton's competency to select his method of execution is, in effect, subsumed by the question of whether Walton is competent to be executed. Accordingly, the court will reserve judgment on Walton's third claim until after hearing evidence of Walton's competency at the evidentiary hearing.[8]

## V.

For the reasons stated, the court dismisses Walton's claim of mental retardation and orders an evidentiary hearing on the question of whether Walton is competent to be executed. An appropriate order will be entered this day.

### ORDER

In accordance with the court's memorandum opinion entered on this date, it is **ORDERED** and **ADJUDGED** as follows:

1. Walton's claim that his execution is barred because he is mentally retarded is **DISMISSED**;

2. The court will conduct an evidentiary hearing on July 28, 2003, 9:00 a.m. at the Poff Federal Building, Roanoke, Virginia, on Walton's claim that he is incompetent to be executed, hearing such witnesses as it considers appropriate;

3. On or before July 14, 2003, Walton is directed to file and serve a list of his proposed witnesses, briefly summarizing each witness' expected testimony;

4. On or before July 21, 2003 the respondent is directed to file and serve a list of his proposed witnesses, briefly summarizing each witness' expected testimony;

5. Further discovery is unwarranted and will be permitted only on such terms and conditions as the parties agree; and

6. The respondent is directed to transport Walton to the Poff Federal Building, Roanoke, Virginia, for the hearing on July 28, 2003.

---

**8.** The Commonwealth also argues that Walton's third claim is moot, and that it is barred because it is a successive petition not autho-

rized by the Fourth Circuit. The court will also reserve judgment on these questions until after the evidentiary hearing.