LUCERO, J., concurring in part and dissenting in part.
I join all but Part II.A of the majority opinion. Two issues prevent my full agreement with my respected colleagues that would lead to my full joinder. (1) It was well-known that bias in the IQ tests used at the time of Postelle's sentencing skewed the scores introduced at trial and presented to the jury to a degree significantly lower than Postelle's true score. Given that Postelle scored in the bottom one tenth of one percentile of children his age on an adaptive behavioral test administered when he was a child, evidence of the IQ score bias-known as the Flynn Effect-should have been fully developed by trial counsel. Failure to do so resulted in manifest prejudice to the defendant, amplified by counsel's presentation of scores evincing a higher degree of mental capacity than justified, compounding the error to a reversible degree. (2) My majority colleagues' suggestion that defense counsel can delegate development of the overall litigation strategy and investigation of the law to a testifying psychologist is clearly erroneous. Although the bar to relief is high under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adequate representation by counsel, particularly in a capital case, mandates a complete investigation and presentation of mitigating evidence. The failure to fulfill that duty by counsel in the case before us compels me to respectfully dissent.
I
The majority opinion capably lays out the facts of the crime for which Gilbert Postelle was convicted. It omits, however, a considerable amount of evidence presented in mitigation and on appeal, which provides necessary background. In context, counsel's failure to raise the Flynn Effect violated Postelle's right to effective assistance of counsel under Strickland.
Assuredly, trial counsel did present evidence that Postelle's childhood was highly dysfunctional and that he had been seriously mentally impaired since childhood. Postelle's maternal aunt and his sister testified that mental illness ran in his family. His mother, Dawn, was so mentally ill that, at the time of trial, she was committed to an inpatient mental institution in Arizona. The defense's expert witness, Dr. Ruwe, testified that Postelle suffered from significant neurocognitive problems and severe psychological problems. Later, upon *1227 being provided with a complete family history by post-conviction counsel, Dr. Ruwe diagnosed Postelle with major depressive disorder with psychotic features, and found that he exhibited symptoms of post-traumatic stress disorder and possible schizophrenia.
Dr. Ruwe's testimony at the sentencing phase of the trial merely touched upon his analysis of Postelle's mental state, despite the fact that "courts have repeatedly found [evidence of mental illness] to be powerful mitigation." Wilson v. Sirmon, 536 F.3d 1064, 1093 (10th Cir. 2008). Counsel on direct appeal failed to conduct any further investigation, despite the indications present in the trial transcript that mental illness may have been a viable mitigation claim, and that Postelle's "borderline" IQ scores might not accurately capture his mental capacity. Only collateral counsel completed the basic investigation that unearthed the depth of Postelle's cognitive and psychological issues. This failure may have to do with the fact that Postelle was, according to his counsel on direct appeal, incapable of meaningfully assisting her. He failed to disclose any information regarding the facts of the crime to his lawyers or their investigators, and appeared to be ignorant of the seriousness of the proceedings and the nature of his sentence. Post-conviction counsel confirmed the impressions of direct appeal counsel, reporting that when they attempted to discuss Postelle's case with him he spent "most of the time giggling, laughing inappropriately, and staring up at the ceiling."
Multiple individuals who had known Postelle throughout his life testified that he had significant mental impairments from a very young age: he was "different from the rest of the kids," "accident prone," and "slow at processing things." He "believed everything he was told," "couldn't understand when people were joking," and took frequent and unnecessary risks. Many of Postelle's friends and family members reported that they had not been contacted by any of Postelle's lawyers, save his post-conviction counsel, and that if they had been, they would have testified to their observation of Postelle's mental disability. Others indicated that, although they had spoken to Postelle's trial attorneys, they were not asked about his mental health, cognitive function, or family history of mental illness.
School records presented at trial indicated that Postelle was removed from mainstream schooling and placed in special education early in elementary school, where he remained until he dropped out of school at the age of twelve. In 1999, shortly before leaving school, Postelle was given an Adaptive Behavior Inventory, a type of adaptive functioning test, and scored in the bottom 0.1 percentile-that is, about 99.9 percent of children his age outperformed him. According to this assessment, at the age of twelve, when most children would be finishing sixth grade, Postelle was "beginning" to use spoken language to convey information to others, read a few simple sight words, and become aware of the perceptions of others. He was unable to answer questions about a story he had just read, convey knowledge in writing, do work independently without disturbing others, or make appropriate comments in group situations. He had not mastered any skills, including telling time or knowing the names and values of coins and bills.
In November 2006, Postelle took the Wechsler Adult Intelligence Scale, Third Edition ("WAIS-III") and scored a 79. In March 2007, Postelle took the Wechsler Abbreviated Scale of Intelligence ("WASI") and received a score of 76. Without adjustment for either the standard of error or the Flynn effect, these scores fell within the range considered to indicate "borderline mental disability." See T.P. Alloway, *1228 Working Memory and Executive Function Profiles of Individuals with Borderline Intellectual Functioning, 54 J. Intell. Disability Res. 448, 449 (2010). People with borderline mental disability generally have limited skills related to planning, decision making, and spoken language. Marsha Mailick Seltzer et al., Life Course Impacts of Mild Intellectual Deficits, 110 Am. J. Mental Retardation 451, 451 (2005).
II
In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court struck down a state statute that provided that the death penalty was mandatory for certain crimes, unless one of three potentially mitigating factors applied. Id. at 593-94, 98 S.Ct. 2954. The Court noted that "the concept of individualized sentencing" had long been a central principle of American law and that sentencing judges had traditionally been able to consider a wide variety of facts about the offender and the crime itself. Id. at 602-03, 98 S.Ct. 2954. In capital cases particularly, "the fundamental respect for humanity underlying the Eighth Amendment" requires individualized consideration of the particular offender and offense "as a constitutionally indispensable part of the process of inflicting the penalty of death." Id. at 603, 98 S.Ct. 2954 (quotation omitted).
Therefore, the Eighth and Fourteenth Amendments require that the sentencer "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Id. at 604, 98 S.Ct. 2954. Because Ohio's statute did not permit such consideration, it was held unconstitutional. Id. at 608, 98 S.Ct. 2954. This requirement that individual mitigating factors be considered in imposing death reflects "the law's effort to develop a system of capital punishment at once consistent and principled but also humane and sensible to the uniqueness of the individual." Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).
The Eddings Court expanded on Lockett's directive. Monty Eddings, who was sixteen when he killed a police officer, had experienced an extremely difficult upbringing and suffered from severe emotional and psychological disorders. Id. at 105-06, 102 S.Ct. 869. In sentencing him to death, the trial judge noted that he had considered Eddings' youth but could not, under the law, consider the abuse Eddings experienced as a child or his various mental afflictions. Id. at 108-09, 112-13, 102 S.Ct. 869. The Oklahoma Court of Criminal Appeals ("OCCA") affirmed, holding that Eddings' "family history" and mental illness were "useful in explaining why he behaved the way he did" but could not be used in mitigation because it "did not excuse his behavior." Id. at 109-10, 102 S.Ct. 869. The Supreme Court reversed, concluding that "[e]vidence of a difficult family history and of emotional disturbance" is relevant mitigating evidence. Id. at 114, 102 S.Ct. 869. It might have been permissible for the sentencing authority to conclude that, as a matter of fact, there was insufficient evidence of mental illness or child abuse, but it was not permissible to determine that such evidence could not properly be considered. Id.
Evidence of emotional disturbance and violent family history, including an alcoholic mother and a physically abusive father, was determined particularly relevant because Eddings was young at the time of the crime. Id. at 116, 102 S.Ct. 869. The Court reasoned that, at sixteen, an average adolescent might be expected to lack the maturity of an adult and, given Eddings' severe emotional problems, violent family background, and below-average intelligence, he was perhaps even less mature *1229 than his chronological age would suggest. Id. Mitigating facts of his mental illness and his difficult background did not excuse his crime, but "the background and mental and emotional development of a youthful defendant [must] be duly considered in sentencing." Id.
Under Lockett and Eddings, Postelle clearly had a broad right to bring in a wide variety of mitigating evidence, provided that it related to his own personal characteristics or to the circumstances of the crime. Further, under Strickland, he had the right to counsel to adequately represent him. Adequate representation in the capital context has long been understood to mean a reasonable, complete investigation and presentation of mitigating evidence. Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
In Williams, the Supreme Court reversed a death sentence because the defendant's counsel had failed to adequately investigate and present evidence of his intellectual disability and abusive childhood. Id. Williams' trial counsel failed to obtain records that would have revealed that Williams had been severely beaten by both of his parents as a child. Id. at 395, 120 S.Ct. 1495. Counsel also failed to introduce evidence available at the time of trial indicating that Williams was "borderline [intellectually disabled]" and did not advance beyond sixth grade. Id. at 396, 120 S.Ct. 1495. Not all of the evidence regarding Williams' background was favorable to him, but the Court concluded that a tactical decision to focus on another aspect could not have justified the omission of the "voluminous" amount of evidence in Williams' favor, and that their omission could only indicate a failure to investigate the client's background. Id.
In Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Court again reversed a death sentence due to trial counsel's inadequate investigation into mitigation evidence. There, trial counsel hired a psychologist and researched both social service records and the defendant's presentence investigation report. Id. at 524, 123 S.Ct. 2527. Yet these efforts were determined to be inadequate because counsel had failed to hire a forensic social worker to prepare a social history report. Id. The Court held this failure, despite counsel's other investigative efforts, fell short of the American Bar Association's requirement that counsel make "efforts to discover all reasonably available mitigating evidence." Id. (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), 93 (1989) ). The Court concluded that competent counsel, knowing the extent of the abuse that Wiggins suffered, would have investigated further and then introduced mitigating evidence related to that abuse at trial. Id. at 535, 123 S.Ct. 2527. Due to counsel's failure to investigate, the jury did not hear evidence that the defendant had been frequently abused and neglected by his alcoholic mother. Id. The jury also did not hear that Wiggins had significantly diminished mental capacities. Id. The omission of this "considerable mitigating evidence" meant that Wiggins was deprived of constitutionally adequate counsel. Id. at 536, 123 S.Ct. 2527.
In Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), trial counsel interviewed five of the defendant's family members and employed three mental health experts. Id. at 381-82, 125 S.Ct. 2456. Despite knowing that Rompilla had a criminal record and had left school in the ninth grade, trial counsel did not examine the records of his schooling or his prior incarcerations. Id. at 382, 125 S.Ct. 2456. The Supreme Court once again overturned the sentence, holding that, if his counsel had located and read these records-especially his easily available criminal records-they would have found a range of *1230 mitigation leads, including a suggestion that he was cognitively impaired and suffered from schizophrenia. This would have built a stronger mitigation case. Id. at 390-91, 125 S.Ct. 2456.
In summary, investigation and presentation of mitigation evidence is a vital function of counsel in a capital punishment penalty phase trial. Wiggins, 539 U.S. at 522, 123 S.Ct. 2527 ; Eddings, 455 U.S. at 112, 102 S.Ct. 869. "[A] consistency produced by ignoring individual differences is a false consistency." Eddings, 455 U.S. at 112, 102 S.Ct. 869. Evidence of a defendant's abusive family background, lack of education, and reduced cognitive capacity is particularly strong mitigating evidence. Wiggins, 539 U.S. at 535, 123 S.Ct. 2527.
III
By the time of Postelle's trial in 2008, the Flynn Effect was sufficiently well observed and documented that a reasonable capital defense attorney, preparing for a presentation of mitigating evidence, should have discovered and presented it. Particularly, given that the materials available to and used by trial counsel indicated that Postelle left school at twelve after experiencing learning difficulties, suffered significant childhood trauma, and had reduced mental capabilities, counsel had a duty to competently research diminished mental capacity. Had counsel done so, they would have discovered the Flynn Effect, adding significant weight to the contention that Postelle's crime was mitigated by his level of mental impairment.
As the majority opinion ably explains, the Flynn Effect is an observed phenomenon in which IQ scores increase by approximately 0.3 points for every year that has elapsed since the test was normed. (Majority Op. 1209-10.) James R. Flynn first observed the phenomenon in 1984 (24 years before Postelle's trial) when he noted that, between 1932 and 1978, the IQ score of a representative sample of Americans rose an average of 13.8 points. James R. Flynn, The Mean IQ of Americans: Massive Gains 1932 to 1978, 95 Psych. Bull. 29, 29 (1984). By the time of Postelle's trial in 2008, the Flynn Effect had not only gained acceptance within the scientific community but was commonly mentioned in capital punishment cases. See, e.g., People v. Superior Court (Vidal), 40 Cal. 4th 999, 1006 n.4, 56 Cal.Rptr.3d 851, 155 P.3d 259 (2007), and the voluminous collection of cases in footnote 1.[1]
*1232 Postelle's IQ has been tested twice. First, in November 2006, he scored a 79. When adjusted for the Flynn Effect, this score falls to 74. See James R. Flynn, The WAIS-III and WAIS-IV: Daubert Motions Favor the Certainly False over the Approximately True, 16 Applied Neuropsychol. 98, 103 (2009).[2] In March 2007, he scored a 76. Deducting the standard 0.3 points for each year between when the WASI was normed and when Postelle took it, this score also becomes a 74. Additionally, the statistical analysis built into these tests themselves is not perfect. Because the score produced is not entirely certain, each test produces a 95 percent confidence interval-a range of values such that there is a 95 percent probability that the true IQ score lies within it. Postelle's original, unadjusted WAIS-III test indicated that there was a 95 percent probability that his true IQ score was between 75 and 83. When corrected for the Flynn Effect, this range drops by five points, so that Postelle's IQ score in fact likely falls between 70 and 78. His second test, the WASI, produced a 95 percent confidence interval of 72 to 81. The Flynn Effect when applied to that second test shows that, in fact, there is a 95 percent probability that his true score lies between 70 and 79.
Instead of presenting evidence that Postelle's correct IQ score was 74 and could in fact be as low as 70, however, his counsel presented evidence that it was either a 76 or a 79. No party made any mention of the Flynn Effect during his trial or his direct appeal. It was first mentioned by the defense at the post-conviction relief stage. After Postelle argued that his trial and appellate counsel should have introduced evidence that would have more accurately captured his IQ score, both for the purpose of challenging whether he could constitutionally be executed under Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and for the purpose of mitigation, the OCCA addressed only the first argument, without mention of the second potential purpose of this evidence.
By failing to address Postelle's argument that the Flynn Effect evidence could be used for the purpose of mitigation rather than merely for the purpose of determining whether Atkins applied, the OCCA failed to adjudicate Postelle's claim on its merits.[3] Thus, the deferential standard of review usually required by the Antiterrorism and Effective Death Penalty Act does *1233 not apply in this case. 28 U.S.C. § 2254(d) ; see also Chadwick v. Janecka, 312 F.3d 597, 606 (3d Cir. 2002) ; Grant v. Royal, 886 F.3d 874, 889 (10th Cir. 2018) ; Grant, 886 F.3d at 961, 967-70 (Moritz, J., dissenting). Instead, "we exercise our independent judgment and review the federal district court's conclusions of law de novo, and its factual findings for clear error." Grant, 886 F.3d at 889 (quotations omitted). See also Hooks v. Workman, 689 F.3d 1148, 1163-64 (10th Cir. 2012).
The majority opinion holds that the OCCA's failure to address the mitigation-related argument was excusable because Postelle's counsel's failure to identify and present Flynn Effect evidence did not rise to the level of constitutional inadequacy under Strickland. The majority argues first that the defense counsel relied legitimately on its expert witnesses given that the expert witness defense counsel consulted, Dr. Ruwe, did not raise the Flynn Effect. (Majority Op. 1215-16.) This argument misapprehends the role of experts. An expert witness provides testimony that bolsters the litigation strategy created by counsel. This is why counsel often retains multiple consulting experts, some of whom never testify at trial. See Loren Kieve, Retaining an Expert, in Litigators on Experts, 18, 18 (Wendy Gerwick Couture & Allyson W. Haynes eds., 2011). The concept of an independent expert-one who might contradict, undermine, or revise counsel's litigation strategy-is virtually unheard of in American law. Ellen Deason, Court-Appointed Expert Witnesses: Scientific Positivism Meets Bias and Deference, 77 Or. L. Rev. 59, 65 (1998).
The legal duty to fully investigate and develop a particular aspect of a client's case, particularly in the capital context, is not delegated to an expert merely because one is hired. Investigation of the facts and legal parameters of a case and the expert's field should guide the retention and use of an expert. It was counsel's duty to hire experts who would testify to conclusions that the attorneys felt would advance their client's cause. In Postelle's case, his counsel hired an expert who testified that he was not intellectually disabled. Given the defendant's background and available mitigation evidence, that is not a reasonable litigation strategy. Counsel cannot now fall back on that expert for their failure to introduce additional evidence that would contradict those conclusions and develop a potentially successful result. An expert's role is not to assume the role of counsel but to assist in the presentation of a case in its best light. Thus, the experts hired in Postelle's trial cannot serve to inoculate his counsel against claims of constitutional inadequacy.
The Supreme Court's opinion in Rompilla further demonstrates that the retention of an expert witness does not necessarily demonstrate that trial counsel adequately represented the defendant. In that case, trial counsel retained three mental health experts but failed to review records of the defendant's prior convictions, which would have shown that he had exhibited symptoms of serious mental health issues. The Court noted that, although the mental health experts' reports had indicated a "benign conception of Rompilla's upbringing and mental capacity," further research would have led trial counsel to question those reports and build a stronger mitigation case. Rompilla, 545 U.S. at 391, 125 S.Ct. 2456. Although the majority opinion argues that an expert witness may be presumed to apply their expertise to the case (Majority Op. 1216 n.9), Rompilla makes clear that counsel may not assume that an expert will cover the scientific field.
Similarly, in Postelle's case, expert testimony and the affidavits of family members, which trial counsel gathered, should have prompted his counsel to investigate *1234 cognitive limitations as a mitigating factor. Not unlike the situation that prompted the Supreme Court to overrule the defendant's death sentence in Wiggins, Postelle's trial counsel had materials that indicated he had serious mental capacity issues. His IQ scores were borderline, his family members reported concerns about his cognitive capacities, and he dropped out of school when he was very young. Dr. Ruwe testified that while he was competent for Atkins purposes, he experienced significant cognitive issues. This range of mitigation leads should have prompted competent counsel to further investigate Postelle's cognitive capacity. Had counsel exercised due diligence in their research, they would have discovered that the Flynn Effect could explain Postelle's IQ scores. I stress, the Flynn Effect was well-known in 2008 in the legal field and in the scientific community: a simple search would have discovered it.
The majority opinion further argues that Flynn Effect evidence might not have made much difference if it had been introduced for mitigation purposes. (Majority Op. 1216-19.) The majority notes that "this is not a case where counsel simply ignored [ ] evidence or used it against the defendant." (Majority Op. 1219.) However, counsel did in fact use artificially high IQ scores in a manner that cut against Postelle. This line of reasoning misapprehends the nature of an IQ score. A score of 75 or lower is low enough to call into serious question an individual's capacity. As a constitutional matter, a score of 75 or below entitles a defendant to an inquiry into whether he is intellectually disabled. Hall v. Florida, 572 U.S. 701, 134 S.Ct. 1986, 2000, 188 L.Ed.2d 1007 (2014). As a practical matter, such a score can reasonably be expected to suggest to a jury that a defendant lacks the intellectual capacity to bear full culpability for his crimes. On the other hand, a score above 75 suggests the opposite-it suggests, as a legal and practical matter, that the test-taker has below-average but not deficient intellectual function. Thus, an IQ score, by its very nature, either indicates intellectual disability or its absence. In this case, Postelle's counsel did not merely fail to bring evidence that he had a score below 75; instead, they brought evidence that he had a score above 75.
I repeat: Postelle's counsel did not merely fail to introduce evidence of Postelle's lower adjusted scores; they instead introduced scores that were erroneously high. Counsel's failure to introduce the Flynn Effect amounted not to the mere omission of mitigation evidence but rather to the introduction of evidence that went against mitigation. These artificially high IQ scores are in tension with family testimony that Postelle had been intellectually challenged since he was a small child. They indicated that Postelle was more intellectually capable than he was, and hence bore more responsibility for his actions than he did.
The majority opinion suggests that trial counsel could have made a strategic choice to omit evidence of the Flynn Effect. (Majority Op. 1216-17.) To the contrary, such evidence would have served an important role within the existing mitigation strategy, not detracted from it. Trial counsel emphasized Postelle's youth, and the extent to which methamphetamine use had impacted his brain development and educational trajectory. A diagnosis of intellectual disability would have fit well into the defense's narrative-and significantly strengthened Postelle's mitigation case-without contradicting or undermining any of the evidence counsel did present.
The correct IQ scores would have provided valuable context to the jury for the facts of the crimes themselves. Postelle was only eighteen at the time of the murders. He was urged to participate by his *1235 father and older brother. As the Supreme Court has acknowledged, there is "abundant evidence that [people with intellectual disabilities] often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." Atkins, 536 U.S. at 318, 122 S.Ct. 2242. In context, such a diagnosis would have been particularly powerful mitigation evidence.
By failing to identify and present a well-documented scientific phenomenon that had well made its way into the legal landscape of capital defense, and by neglecting to locate and present that vital evidence, Postelle's trial counsel presented a mitigation case that erroneously depicted him as more capable, more cunning, and more culpable than he was. Ignorant of the Flynn Effect and presented with artificially high IQ scores, the jury sentenced Postelle to death. This profound failure by Postelle's counsel erroneously deprived Postelle of his constitutional right to counsel in violation of Strickland.

Other pre-2008 cases in which courts have discussed the Flynn Effect include Cole v. Branker, No. 5:05-HC-461-D, 2007 WL 2782327, at *22 (E.D.N.C. Sept. 20, 2007) (unpublished) (rejecting a Flynn Effect argument on the basis that the defendant did not explain how the Flynn Effect would show evidence of intellectual disability before age 18); Moore v. Quarterman, 491 F.3d 213, 231 (5th Cir. 2007), overruled on other grounds by Moore v. Quarterman, 533 F.3d 338 (5th Cir. 2008) (en banc) (acknowledging that a defendant's IQ score was reduced to account for the Flynn Effect); People v. Superior Court (Vidal), 40 Cal. 4th 999, 1007, 56 Cal.Rptr.3d 851, 155 P.3d 259 (2007) (noting the lower court's acceptance of the Flynn Effect's validity); Williams v. Campbell, No. 04-0681-WS-C, 2007 WL 1098516, at *47 (S.D. Ala. Apr. 11, 2007) (unpublished) (acknowledging the potential impact of the Flynn Effect); In re Mathis, 483 F.3d 395, 398 n.1 (5th Cir. 2007) (noting a Flynn Effect argument articulated below without addressing it); Green v. Johnson, No. 2:05cv340, 2007 WL 951686, at *12 (E.D. Va. Mar. 26, 2007) (unpublished) (indicating that the Flynn Effect was properly considered in analyzing a defendant's IQ score); Winston v. Warden of the Sussex I State Prison, No. 052501, 2007 WL 678266, at *15 (Va. Mar 7, 2007) (unpublished) (rejecting a Flynn Effect argument on the basis that the Flynn Effect would not show evidence of intellectual disability before age 18); Ex parte Blue, 230 S.W.3d 151, 166 (Tex. Crim. App. 2007) (declining to consider a Flynn Effect argument); United States v. Parker, 65 M.J. 626, 629 (N-M. Ct. Crim. App. 2007) (indicating that the Flynn Effect is properly considered in analyzing a defendant's IQ score); Wiley v. Epps, No. 2:00CV130-P-A, 2007 WL 405041, at *37 (N.D. Miss. Feb. 2, 2007) (unpublished) (noting defendant's argument that the Flynn Effect had been widely known since it was first discovered in 1984); Green v. Johnson, No. CIVA 2:05CV340, 2006 WL 3746138, at *46 (E.D. Va. Dec. 15, 2006) (unpublished) (concluding that it is necessary in capital cases to adjust IQ scores to reflect the Flynn Effect); Van Tran v. State, No W2005-01334-CCA-R3-PD, 2006 WL 3327828, at *12 (Tenn. Crim. App. Nov. 9, 2006) (unpublished) (describing post-conviction testimony regarding the Flynn Effect); Berry v. Epps, No. 1:04CV328-D-D, 2006 WL 2865064, at *35 (N.D. Miss. Oct. 5,2006) (unpublished) (mentioning post-conviction counsel's attempts to admit Flynn Effect evidence); Murphy v. Ohio, No. 3:96 CV 7244, 2006 WL 3057964, at *5 (N.D. Ohio Sept. 29, 2006) (unpublished) (concluding that a state court's refusal to incorporate the Flynn Effect was not reviewable given the procedural posture of the instant case); Conaway v. Polk, 453 F.3d 567, 592 n.27 (4th Cir. 2006) (mentioning the Flynn Effect's potential impact on IQ scores); Moore v. Quarterman, 454 F.3d 484, 499 (5th Cir. 2006), overruled on other grounds by Moore v. Quarterman, 533 F.3d 338 (5th Cir. 2008) (en banc) (noting that the defendant's IQ scores were adjusted to reflect the Flynn Effect); Green v. Johnson, 431 F.Supp.2d 601, 612-617 (E.D. Va. 2006) (granting the defendant's request for an evidentiary hearing to determine whether he was intellectually disabled, based in part on Flynn Effect evidence); Hedrick v. True, 443 F.3d 342, 368 (4th Cir. 2006) (discussing the defendant's failure to raise the Flynn Effect); In re Salazar, 443 F.3d 430, 433 (5th Cir. 2006) (indicating that, even assuming the validity of the Flynn Effect, the defendant's scores were still too high to meet the intellectual disability cutoff); Melican v. Morrisey, No. 041368B, 2006 WL 1075465, at *6 (Mass. Mar. 13, 2006) (unpublished) (assuming the validity of the Flynn Effect); Walton v. Johnson, 440 F.3d 160, 177-78 (4th Cir. 2006) (rejecting a Flynn Effect argument on the basis that the defendant did not explain how the Flynn Effect would render his IQ lower than the cutoff); Ex parte Salazar, No. WR-49,210-02, 2006 WL 8430173, at *1 (Tex. Crim. App. Mar. 9, 2006) (unpublished) (rejecting a Flynn Effect argument on the grounds that the Flynn Effect would not render the defendant's IQ lower than the cutoff); Cummings v. Polk, No. 5:01-HC-910-BO, 2006 WL 4007531, at *31 (E.D.N.C. Jan. 31, 2006) (unpublished) (acknowledging Flynn Effect testimony presented at trial); State v. Burke, No. 04AP-1234, 2005 WL 3557641, at *12 (Ohio Ct. App. Dec. 30, 2005) (unpublished) (concluding that a trial court considering an Atkins claim must consider Flynn Effect evidence); White v. Commonwealth, 178 S.W.3d 470, 485, n.5 (Ky. 2005) (defining the Flynn Effect); Myers v. State, 130 P.3d 262, 268 n.11 (Okla. Crim. App. 2005) (defining the Flynn Effect); Black v. State, No. M2004-01345-CCA-R3-PD, 2005 WL 2662577, at *16, 39-40 (Tenn. Crim. App. Oct. 19, 2005) (unpublished) (rejecting a Flynn Effect argument on state law grounds); People v. Superior Court (Vidal), 129 Cal.App. 4th 434, 450, 559, 28 Cal.Rptr.3d 529 (2005) (indicating that the Flynn Effect was generally accepted in the clinical field in 2005); Walton v. Johnson, 407 F.3d 285, 296 (4th Cir. 2005) (rejecting a Flynn Effect argument on the basis that the defendant did not explain how the Flynn Effect would show manifestation of intellectual disability before age 18); Bowling v. Commonwealth, 163 S.W.3d 361, 374-75 (Ky. 2005) (rejecting a Flynn Effect argument); Walker v. True, 399 F.3d 315, 322-23 (5th Cir. 2005) (remanding for the district court to consider the Flynn Effect); State v. Murphy, No. 9-04-36, 2005 WL 280446, at *2 (Ohio App. Feb. 7, 2005) (noting Flynn Effect evidence presented in post-conviction proceedings); In re Hicks, 375 F.3d 1237, 1242-43 (11th Cir. 2004) (Birch, J., dissenting) (arguing the importance of Flynn Effect evidence in calculating a capital defendant's IQ); Walton v. Johnson, 269 F.Supp.2d 692, 699 n.5 (W.D. Va. 2003), judgment vacated by Walton v. Johnson, 407 F.3d 285 (4th Cir. 2005) (rejecting a Flynn Effect argument on the basis that the defendant did not explain how the Flynn Effect would show manifestation of intellectual disability before age 18).
During the same time frame, a number of articles in legal journals and law reviews also noted the Flynn Effect's importance. See, e.g., Dora W. Klein, Categorical Exclusions from Capital Punishment, 72 Brook. L. Rev. 1211, 1231 n.89 (2007) ; Richard J. Bonnie & Katherine Gustafson, The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases, 41 U. Rich. L. Rev. 811, 837-38, 841, 844 (2007) ; Ana Romero-Bosch, Lessons in Legal History-Eugenics & Genetics, 11 Mich. St. U. J. Med. & L. 89, 105 n.96 (2007) ; James R. Flynn, Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect, 12 Psychol. Pub. Pol'y & L. 170 (2006) ; J. Philippe Rushton & Arthur R. Jensen, Wanted: More Race Realism, Less Moralistic Fallacy, 11 Psychol. Pub. Pol'y & L. 328, 330 (2005) ; Justin B. Shane, Case Note, 17 Cap. Def. J. 481 (2005) ; Linda Knauss and Joshua Kutinsky, Into the Briar Patch: Ethical Dilemmas Facing Psychologists following Atkins v. Virginia, 11 Widener L. Rev 121, 127-28 (2004) ; LaJuana Davis, Intelligence Testing and Atkins: Considerations for Appellate Courts and Appellate Lawyers, 5 J. App. Prac. & Process 297, 309 (2003).

Flynn has continually updated and refined his conclusions, particularly about the WAIS-III. Although the data used above were published in 2009, Flynn's earlier hypotheses would have led to an even larger downward adjustment and would have indicated that Postelle's corrected test result was instead a 73. Id.

The majority correctly notes that, under Johnson v. Williams, 568 U.S. 289, 133 S.Ct. 1088, 185 L.Ed.2d 105 (2013), when a state court adjudicates some but not all of a petitioner's claims, we presume that the court adjudicated all of the claims and rejected them on the merits. (Majority Op. 1214 n.7.) However, the state court's opinion-which emphasized the potential use of the Flynn Effect to show that Postelle was ineligible for capital punishment under Atkins, without mentioning the evidence's potential second use as mitigation evidence-suggests that the court may have instead misconstrued the mitigation argument as the Atkins argument, rather than merely rejecting it on the merits.